[L. A. No. 23261. In Bank. June 27, 1955.]

THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation) et al., Appellants, v. F. BRITTON McCONNELL, as Insurance Commissioner, etc., et al., Respondents.

718

Joseph L. Lewinson, Frank B. Belcher, C. Ray Robinson, Melvin, Faulkener, Sheehan & Wiseman, Henry W. Low and William B. Boone for Appellants.

C. Ray Robinson and William B. Boone, as Amici Curiae on behalf of Appellants.

O'Melveny & Myers, Paul Fussell, Homer I. Mitchell, James E. Cross, George B. Gose, Frank P. Doherty, Guy Knupp and Peery Price for Respondents.

Lloyd W. Dinkelspiel and Heller, Ehrman, White & McAuliffe, as Amici Curiae on behalf of Respondents.

GIBSON, C. J.—The Pacific Mutual Life Insurance Company of California (hereinafter referred to as the "old company") and certain of its stockholders brought this mandamus proceeding in the superior court to review the action of the Insurance Commissioner in approving a plan for mutualization of a second corporation, Pacific Mutual Life Insurance Company (hereinafter called the "new company"), which had been organized by the commissioner as part of the rehabilitation of the old company. The court upheld the action of the commissioner, and plaintiffs have appealed from the judgment.

In 1936 the old company was in a hazardous and insolvent condition within the meaning of the Insurance Code, and its business and assets were taken over by the Insurance Commissioner,* as authorized by statute. (Ins. Code, §§ 1011, 1013.) Pursuant to section 1043 of the code, a rehabilitation agreement was entered into between the new company and Commissioner Carpenter, as conservator of the old company, whereby most of its assets were transferred to the new company in exchange for all the new company's capital stock. The stock was to be held by the commissioner as conservator for the benefit of the creditors, policyholders and stockholders of the old company. The new company assumed substantially

---

*Six successive commissioners, Messrs. Carpenter, Goodcell, Caminetti, Garrison, Downey and Maloney, have passed upon matters relating to the insolvency of the old company.

all the obligations of the old company, including a limited obligation with respect to noncancellable accident and health policies (referred to herein as "non-can policies"), and agreed to set up a special fund for restoration of benefits to holders of those policies.

In December 1936, after a hearing, the superior court approved the rehabilitation agreement and authorized the commissioner to perform all the obligations required on his part. This order was affirmed in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761]. (Affd. in *Neblett* v. *Carpenter*, 305 U.S. 297 [59 S.Ct. 170, 83 L.Ed. 182].) In February 1937, an order was made providing for the liquidation of the old company and appointing the commissioner as liquidator. It was upheld in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 13 Cal.2d 306 [89 P.2d 637]. In 1938 the commissioner transferred the stock of the new company to five trustees who were given legal title to the stock with power to vote it in accordance with the purposes of the rehabilitation agreement. The order approving the transfer was affirmed in *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344 [139 P.2d 908].

The rehabilitation agreement set forth the method by which a plan for mutualization of the new company could be formulated. It provided that 10 per cent of the participating life policyholders could request the new company to create an appointing committee consisting of the president of the Life Insurance Association of America, the president of Stanford University and the provost of the University of California at Los Angeles. The appointing committee was directed to select a price determination committee composed of persons skilled in matters of insurance company valuation. If the price determination committee concluded that voluntary mutualization could be practicably accomplished, it was to propose a plan of mutualization in accordance with the laws of this state. By the terms of the agreement the commissioner, as sole shareholder of the new company, consented in advance to the plan of mutualization to be formulated.

A price determination committee was appointed, consisting of Alva J. McAndless, president of the Lincoln National Life Insurance Company of Fort Wayne, Indiana; Horace R. Bassford, vice president and chief actuary of the Metropolitan Life Insurance Company of New York; Ray D. Murphy, vice president and chief actuary of the Equitable Life Assurance Society of New York; and Albert J. Hettinger, a partner in Lazard Freres and Company, a firm engaged in investment

banking. After three years of study the committee proposed a plan of mutualization, which provides that, upon the occurrence of certain conditions, the new company shall buy all of its own capital stock for $3,000,000, plus interest from December 31, 1948, the price to be augmented should the restoration of benefits under the non-can policies be completed before 1973.

The proposed plan of mutualization was adopted by the directors of the new company on May 5, 1950. On September 22, 1950, after a hearing, Commissioner Downey approved the plan, finding that it would be fair and equitable in its operation, and thereafter it was approved by the policyholders of the new company. This proceeding in mandamus was then brought to review the action of the commissioner, and the trial court concluded that there was substantial evidence to support his findings and that he had not exceeded his jurisdiction or abused his discretion in approving the plan.

Plaintiffs attack the judgment upon numerous grounds, and, although many of their contentions may be disposed of by application of principles of res judicata, we believe that the problems may be more clearly presented by first discussing the propriety of the determination of the various points without regard to the binding effect of prior adjudications.

The first problem which we must consider is whether the proper statutes were followed in the formulation and approval of the mutualization plan. As contemplated by the rehabilitation agreement, all steps in connection with the adoption of the plan were taken pursuant to sections 11525 et seq. of the Insurance Code, which relate to voluntary mutualization of a solvent insurer.* Plaintiffs assert that the applicable statutes for mutualization of the new company are sections 1043 et seq., which govern involuntary mutualization of an insolvent insurer.† The essential differences in procedure

---

*Section 11525 of the Insurance Code provides: "A solvent domestic incorporated insurer having a paid-in capital represented by outstanding shares of capital stock and issuing, on a reserve basis, nonassessable policies of life insurance or of both life and disability insurance, may convert itself into an incorporated mutual life insurer, or life and disability insurer, issuing nonassessable policies on a reserve basis. To that end it may provide and carry out a plan for the acquisition of the outstanding shares of its capital stock for the benefit of its policyholders, or any class or classes of its policyholders, by complying with the requirements of this chapter."

Sections 11526-11533 contain detailed provisions relating to procedure for adoption and execution of the plan of mutualization.

†Section 1043 of the Insurance Code provides in part: "In any proceeding under this article, the commissioner, as conservator or as

722

are that under the sections relating to voluntary mutualization of a solvent company the plan is adopted by the directors, subject to approval by the stockholders and the commissioner, and no court proceedings are necessary; whereas under the provisions for involuntary mutualization of a seized insurer the plan is formulated by the commissioner as conservator without consent of the stockholders or directors, and it must be approved by the court.

 The new company is solvent and nondelinquent, and there is no sound reason why it should be mutualized under the statutes relating to insolvent insurers. The commissioner had power to create the new corporation in order to preserve the business of the seized insurer. Section 1043, which authorizes the commissioner to enter into rehabilitation agreements, contains no express limitation on what may be included in them, and section 1037 provides that the enumeration of the powers of the commissioner shall not be construed as a limitation upon him or upon his right to do such other acts as he may deem necessary in connection with the handling of the affairs of an insolvent company.* When salvaging the business of a seized insurer the greatest possible protection should be given to creditors and other interested parties, and in the present instance the commissioner evidently concluded that this objective could best be accomplished through the formation of a new company divorced as far as possible from the control of those who were in charge of the old company when it experienced financial difficulties.

 The new company is a separate and distinct entity, and when the business was transferred it ceased to be the

liquidator, may, subject to the approval of said court, and subject to such liens as may be necessary mutualize or reinsure the business of such person, or enter into rehabilitation agreements.'' The words ''such person'' include an insolvent insurer as referred to in sections 1010 et seq. of the Insurance Code dealing with insolvency and delinquency.

Section 1045 provides: ''If at any time after the issuance of an order under section 1011 . . . it shall appear to the commissioner that the purposes of section 1011 can be best attained by the mutualization of such life insurer, the commissioner may formulate a plan for the mutualization of such insurer.'' Section 1046 et seq. set forth the necessary procedural steps.

*Section 1037 of the Insurance Code provides in part: ''The enumeration, in this article, of the duties, powers and authority of the commissioner in proceedings under this article shall not be construed as a limitation upon the commissioner, nor shall it exclude in any manner his right to perform and to do such other acts not herein specifically enumerated, or otherwise provided for, which he may deem necessary or expedient for the accomplishment or in aid of the purpose of such proceedings.''

business of the old company and became the business of the new company. In *Garrison* v. *Pacific Mut. L. Ins. Co.*, 83 Cal.App.2d 1, 9-10 [187 P.2d 893], it was held that the identity of the new company "is utterly distinct from that of old company," that it "cannot be fairly said that it is a continuance of old company," and that the new company "is a separate entity that came into being after old company's insolvency was declared. . . ." ■ The fact that the new company may for some purposes have served as an agent or instrumentality of the commissioner does not destroy its identity as a separate company. ■ Accordingly, as contemplated by the rehabilitation agreement, the applicable statutory provisions for mutualization of the new company are those found in section 11525 et seq., which govern voluntary mutualization of solvent nondelinquent insurers.

■ Plaintiffs nevertheless contend that it was improper to follow the procedure set up in the code for mutualization of a solvent company because, they assert, the commissioner in doing so was forced to act in a dual capacity with conflicting interests. Section 11526, which prescribes the method to be followed in mutualizing a solvent insurer, provides that the plan shall be: ". . . (b) Approved by the vote of the holders of at least a majority of the outstanding shares at a special meeting of shareholders called for that purpose, or by the written consent of such shareholders. (c) Submitted to the commissioner and approved by him in writing." Commissioner Carpenter as the sole holder of the stock of the new company consented in advance to the plan of mutualization, and Commissioner Downey approved it after holding a hearing to ascertain if the plan would be fair and equitable in its operation. Plaintiffs claim that the responsibilities of the commissioner under subdivision (c) are different from and may conflict with his duties under subdivision (b). Even if there might be such a conflict under some circumstances, it would not follow that it was improper to adopt the statutory procedure set forth for the mutualization of a solvent company. The legislative scheme for the mutualization of solvent nondelinquent insurers would in some instances be defeated if the commissioner were disqualified for the reasons urged by plaintiffs, and it must be assumed that the Legislature realized that the commissioner might be required to pass upon the fairness of a plan in a case where he, acting as conservator, had previously consented to mutualization on behalf of the stockholders. In numerous cases where the action of an admin-

istrative officer was necessary to prevent defeat of the statutory scheme, his participation has been upheld, although the grounds for disqualification were much more serious than those raised here. (For example, see *Thompson* v. *City of Long Beach*, 41 Cal.2d 235, 243-244 [259 P.2d 649]; *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344, 365-366 [139 P.2d 908]; *Federal Const. Co.* v. *Curd*, 179 Cal. 489, 493-495 [177 P. 469, 2 A.L.R. 1202]; *Scannell* v. *Wolff*, 86 Cal.App.2d 489, 492-493 [195 P.2d 536]; *Nider* v. *Homan*, 32 Cal.App.2d 11, 13 [89 P.2d 136].) The fact that Commissioner Carpenter gave advance consent on behalf of the stockholders to a plan of mutualization did not disqualify Commissioner Downey from passing upon the fairness of the mutualization plan which was promulgated.

An alternative reason for rejecting plaintiffs' claim that it was improper to follow the procedure set forth in sections 11525 et seq. in the mutualization of the new company is that the validity of the rehabilitation agreement, which provided for voluntary mutualization, is now res judicata. A copy of the agreement was attached to and made a part of the petition which sought approval of the agreement. The petition was filed pursuant to section 1043, which provides that rehabilitation agreements entered into by the commissioner are subject to the approval of the superior court. The validity of all the provisions of the agreement was put in issue by the petition and determined by the court. The order of December 4, 1936, approved the agreement "and each and all of the terms and conditions thereof, and the plan therein embodied," reciting that all interested parties had been given a reasonable opportunity to be heard on "the question of fairness, justice, equity, feasibility, and propriety" of the agreement and the plan. All parties were forever enjoined from making any complaint with respect to the agreement or any provisions thereof. This order was affirmed in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761]. (See also *Carpenter* v. *Pacific Mut. L. Ins Co.*, 13 Cal.2d 306, 314-316 [89 P.2d 637]; *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344, 351-352 [139 P.2d 908].)

■ While different causes of action were involved in the present proceeding and the one leading to the order approving the rehabilitation agreement, the parties were the same, and it is settled that even though the causes of action be different, the prior determination of an issue is conclusive in a subsequent suit between the same parties as to that issue

and every matter which might have been urged to sustain or defeat its determination. (*Shore* v. *Shore,* 43 Cal.2d 677, 682 [277 P.2d 400]; *Krier* v. *Krier,* 28 Cal.2d 841, 843 [172 P.2d 681]; *De Hart* v. *Allen,* 26 Cal.2d 829, 831 [161 P.2d 453]; *Estate of Keet,* 15 Cal.2d 328, 334 [100 P.2d 1045]; *Sutphin* v. *Speik,* 15 Cal.2d 195, 201 et seq. [99 P.2d 652, 101 P.2d 497]; *Caminetti* v. *Board of Trustees,* 1 Cal.2d 354, 356 [34 P.2d 1021]; *Price* v. *Sixth District Agri. Assn.,* 201 Cal. 502, 510 et seq. [258 P. 387].) Inconsistent language found in certain opinions of the District Court of Appeal must be disapproved. (*Green* v. *Green,* 66 Cal.App.2d 50, 59 [151 P.2d 679]; *Babcock* v. *Babcock,* 63 Cal.App.2d 94, 97 [146 P.2d 279]; *Bank of America* v. *McLaughlin,* 22 Cal.App. 2d 411, 417 [71 P.2d 291, 72 P.2d 554].) The basic issue before the court when the agreement was submitted for approval was the propriety of each of its provisions, and the determination of that issue is conclusive as to every matter which might have been urged to sustain or defeat its determination.

It is contended that the order approving the rehabilitation agreement may be collaterally attacked upon the theory that the mutualization procedure provided for in the agreement followed the wrong statutory provisions and that therefore the order is void. For the purpose of passing upon this question we shall assume, contrary to what we have just decided, that the wrong statutes were used in the mutualization of the new company.

It is the general rule that a final judgment or order is res judicata even though contrary to statute where the court has jurisdiction in the fundamental sense, i. e., of the subject matter and the parties. In the consideration of problems arising in this field it should be kept in mind that there is a difference between lack of jurisdiction in the fundamental sense, which is ordinarily essential for collateral attack, and the broader meaning of the term "lack of jurisdiction" when used in determining the availability of prohibition or certiorari to review an order or judgment. Some cases involving collateral attack have unfortunately failed to recognize this distinction. (For discussion of the distinction, see *Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 287-291 [109 P.2d 942, 132 A.L.R. 715]; *Tide Water Assoc. Oil Co.* v. *Superior Court,* 43 Cal.2d 815, 821 [279 P.2d 35].)

In some instances the requirements of a statute may relate to subject matter jurisdiction, and disregard of the

statute may render a judgment void and subject to collateral attack. (See, for example, *Grannis* v. *Superior Court,* 146 Cal. 245, 254-255 [79 P. 891, 106 Am.St.Rep. 23] ; *cf. Rogers* v. *Cady,* 104 Cal. 288, 291-292 [38 P. 81, 43 Am.St.Rep. 100] [constitutional provision].) ▆▆ In the present case, however, it is clear that the court which approved the rehabilitation agreement had jurisdiction of the subject matter and the parties, and, unless the case comes within some exception, collateral attack cannot be based on the ground that the court authorized mutualization to proceed under the wrong statute.

▆▆ Closely analogous to the problem involved here are cases holding that probate decrees are res judicata, although they direct distribution pursuant to wills which are contrary to statute, since the court sitting in probate, like a court passing upon a rehabilitation agreement, is under a duty to determine the validity of the instrument before it. (*Estate of Loring,* 29 Cal.2d 423, 427 et seq. [175 P.2d 524] ; *Crew* v. *Pratt,* 119 Cal. 139, 147 et seq. [51 P. 38] ; *Estate of Gardiner,* 45 Cal.App.2d 559, 562 et seq. [114 P.2d 643] ; *McGavin* v. *San Francisco P.O.A. Soc.,* 34 Cal.App. 168, 170 et seq. [167 P. 182].) ▆▆ Similarly analogous are cases holding that an order settling a trustee's account is res judicata as to the propriety of the purchase of investment certificates which were issued contrary to statute. (*Willson* v. *Security-First Nat. Bank,* 21 Cal.2d 705 [134 P.2d 800] ; *Estate of Crane,* 73 Cal.App.2d 93 [165 P.2d 940] ; *cf. Fergodo* v. *Donohue,* 40 Cal.App. 670 [181 P. 819].) *Estate of Rowe,* 66 Cal. App.2d 594 [152 P.2d 765], which is contrary to the cases cited above, is disapproved.

▆▆ The principle of res judicata has also been applied as a basis for holding that judgments enforcing contracts are a bar to the defense of illegality in subsequent litigation. (*Andrews* v. *Reidy,* 7 Cal.2d 366 [60 P.2d 832] ; *De Hart* v. *Allen,* 49 Cal.App.2d 639, 646 [122 P.2d 273], approved in *De Hart* v. *Allen,* 26 Cal.2d 829, 830-831 [161 P.2d 453] ; *cf. Short* v. *Short,* 106 Cal.App. 210, 215 [288 P. 1111].) Another instance in which the doctrine was applied is *San Diego Trust & Sav. Bank* v. *Young,* 19 Cal.2d 98 [119 P.2d 133], where the prior judgment reduced the time for redemption contrary to statute. The San Diego case impliedly overruled *Anthony* v. *Janssen,* 183 Cal. 329 [191 P. 538], and *Tonningsen* v. *Odd Fellows' Cemetery Assn.,* 60 Cal.App. 568 [213 P. 710]. It has also been held that a judgment, which was contrary to the Constitution because it was based

upon a statute later held invalid, was nevertheless res judicata in a subsequent suit, the court stating that objections to the statute should have been raised in the prior proceeding. (*Chicot County Drainage Dist.* v. *Baxter State Bank,* 308 U.S. 371, 376, 378 [60 S.Ct. 317, 319-320, 84 L.Ed. 329].) The Chicot case is quoted with approval in *Mueller* v. *Elba Oil Co.,* 21 Cal.2d 188, 205-206 [130 P.2d 961], and was cited in *Rescue Army* v. *Municipal Court,* 28 Cal.2d 460, 463-464 [171 P.2d 8].

There are some recognized exceptions to the general rule that collateral attack will not be allowed where there is fundamental jurisdiction even though the judgment is contrary to statute. ▮▮▮ For example, a judgment may be collaterally attacked where unusual circumstances were present which prevented an earlier and more appropriate attack. (See 1 Witkin, California Procedure (1954), 411-412.) In *Burtnett* v. *King,* 33 Cal.2d 805 [205 P.2d 657, 12 A.L.R.2d 333], collateral attack was permitted against a default divorce decree which awarded all the community property to the plaintiff in the absence of a prayer therefor in the complaint, contrary to the provision in section 580 of the Code of Civil Procedure that relief in a default case cannot exceed that demanded in the complaint. The defendant in the divorce action had no notice or warning that the property would be affected by a default judgment, and the opinion points out that the decision would sanction a trap if it held that his property rights had been disposed of since he would properly have assumed from the complaint that his rights to the property were not to be litigated at that time. (33 Cal.2d at p. 811.) The present case is readily distinguishable, since there was nothing to prevent the questions which are raised with regard to the validity of the rehabilitation agreement from being litigated in the proceedings which led to the order approving the agreement.

▮▮▮ Proceedings to prohibit or annul judgments of contempt for violation of injunctions and other equitable orders made contrary to statute may constitute another exception to the general rule. (*Harlan* v. *Superior Court,* 94 Cal.App.2d 902, 904-905 [211 P.2d 942]; *Hunter* v. *Superior Court,* 36 Cal.App.2d 100 [97 P.2d 492]; *cf. Fortenbury* v. *Superior Court,* 16 Cal.2d 405, 407-408 [106 P.2d 411] [violation of Constitution].) The decisions do not use the term, but the attack in such cases might be considered to be collateral,

and the proceedings apparently fall in a special category because they are penal in nature.

From the foregoing discussion it follows that, even if we assume that the rehabilitation agreement and the order approving it authorized mutualization of the new company under the wrong statutes, the order is nevertheless res judicata.

The next problem is whether there was sufficient compliance with the statutory requirements for voluntary mutualization of solvent insurers. Sections 11525 et seq. provide that the plan of mutualization shall be adopted by the directors and approved by the shareholders, the commissioner and the policyholders. Plaintiffs contend that the actions taken to meet these requirements were in certain respects defective and unauthorized.

The approval of the shareholders to the plan of mutualization was given in the rehabilitation agreement by Commissioner Carpenter as sole stockholder of the new company. As we have seen, the agreement provided for the formulation of a plan of mutualization by the price determination committee, and plaintiffs claim that the commissioner, acting for the shareholders of the new company, was without authority to give advance consent to such a plan. In the absence of statutory provision to the contrary, the stockholders of a solvent company can contract to consent to a future plan of voluntary mutualization (*cf. Market St. Ry. Co.* v. *Hellman,* 109 Cal. 571, 586-587 [42 P. 225]), and no sound reason appears why such an agreement is improper merely because the shares are held by the commissioner as conservator of a seized insurer. The commissioner apparently concluded that a plan for mutualization which could not be destroyed by future action or nonaction of the shareholders was necessary as a means of inducing both former and prospective policyholders to deal with the new company and thus permit its continued existence. The powers vested in the commissioner by sections 1037 and 1043 are sufficiently broad to authorize him, as sole stockholder, to give advance consent to the plan of mutualization. Moreover, the validity of all portions of the rehabilitation agreement, including the provision for advance consent, is res judicata.

The directors adopted the mutualization plan, but it is claimed that the action taken was ineffective because they assertedly did not obtain sufficient information to enable them to properly evaluate the desirability of the plan. They had the benefit of the report of the price determination com-

mittee and the opinions of experts, including actuaries and officers of the company, and it seems obvious that, as a practical matter, directors must ordinarily act on the advice of corporate officers and other persons who have expert knowledge. (See Ballantine & Sterling, California Corporation Laws (1949), p. 110.)

After the directors adopted the plan as formulated by the price determination committee, Commissioner Downey held a hearing which lasted nearly three weeks. Oral and documentary evidence was received, and all interested parties had an opportunity to participate. The commissioner approved the plan after finding that the rights and interests of the new company, its policyholders and shareholders were protected and that the plan would be fair and equitable in its operation. Plaintiffs contend that the findings are not supported by the evidence and that there was a lack of procedural due process at the hearing. In passing upon these contentions, we shall first give consideration to plaintiffs' claim that the trial court, in reviewing the action of the commissioner, should have held a trial de novo. ▮▮▮ The approval of the mutualization plan by the commissioner did not involve any deprivation of property rights or vested rights; it was in essence a permit or license authorizing the new company to purchase its own stock. Under these circumstances the function of the superior court was to determine whether the action taken by the commissioner was arbitrary or constituted an abuse of discretion, and in upholding the action of the commissioner, it properly refused to conduct a trial de novo. (*Southern Calif. Jockey Club, Inc.* v. *California etc. Racing Board,* 36 Cal.2d 167, 174-175 [223 P.2d 1]; *McDonough* v. *Goodcell,* 13 Cal.2d 741, 746-749 [91 P.2d 1035, 123 A.L.R. 1205]; see *Thomas* v. *California Emp. Stab. Com.,* 39 Cal.2d 501, 504 [247 P.2d 561]; *Andrews* v. *State Board of Registration,* 123 Cal.App.2d 685, 694-695 [267 P.2d 352].)

▮▮▮ There is no merit in plaintiffs' claim that the record before the commissioner does not support his approval of the plan. The price determination committee consisted of men highly skilled in matters of insurance company valuation, and they were assisted in the formulation of the plan by Joseph Christman, associate actuary of the Metropolitan Life Insurance Company of New York, two Fellows of the Society of Actuaries, and numerous trained supervisory and clerical employees. Experts testified that the price fixed for the purchase of the stock was fair, that the provisions relating

to the time and manner of payment were necessary for the safety and stability of the new company, that the proposed plan gave due regard and protection to the rights of all persons interested in the new company and would be fair in its operation.

Plaintiffs' contention that there was a denial of procedural due process is based on their claim that the commissioner accepted the conclusions of the price determination committee without having before him all the facts on which those conclusions were based and that the committee itself relied on statistics furnished by its actuary without reviewing all the supporting data. Two members of the price determination committee testified in detail as to how the committee arrived at its determinations, and the actuary testified regarding his report which was introduced in evidence. Thus two of the four members of the committee who were responsible for its report, as well as the actuary who procured most of the data relied on by the committee, were available for cross-examination. These men, as we have seen, were experts in the insurance and investment fields, and the fact that the other members of the committee and the persons who assisted the actuary were not called as witnesses is immaterial, at least in the absence of a showing that plaintiffs sought to obtain their testimony. (*City of Pasadena* v. *City of Alhambra*, 33 Cal.2d 908, 919 [207 P.2d 17].) At the hearing an offer was made to furnish the documents and testimony necessary to explain every detail of the committee's work. No claim is made that any request for data was refused, and plaintiffs have no valid basis for complaint if they failed to make such a request.

The judgment is affirmed.

Shenk, J., Spence, J., and Wood (Fred B.), J. pro tem.,* concurred.

TRAYNOR, J.—I dissent.

Although the Legislature has provided detailed statutory provisions for the mutualization of the business of an insolvent insurer (Ins. Code, § 1045 et seq.), the majority opinion holds in effect that these provisions may be completely nullified by the execution of a rehabilitation agreement under section 1043 of the Insurance Code, if such agreement provides for the voluntary mutualization of a new insurer created for

---

*Assigned by Chairman of Judicial Council.

the purpose of carrying on the business of the old. The commissioner has broad powers in executing rehabilitation agreements, and it may be both proper and desirable for him to make use of a new corporate entity to salvage the business of an insolvent insurer. It does not follow, however, that if the end product of a rehabilitation agreement is to be the mutualization of the business of an insolvent insurer, the statutory provisions with respect to such mutualization may be ignored. To hold that they may be not only renders the provisions with respect to involuntary mutualization superfluous but deprives the interested parties of their right to the protection of court scrutiny of the plan of mutualization. (See Ins. Code, § 1051.)

The importance to the shareholders of the old company of having the court independently pass upon the fairness of the plan of mutualization is demonstrated by the facts of this case. The trial court clearly indicated that had the decision been his, the plan would not have been approved; if the shareholders were entitled to his independent judgment, their rights have been prejudiced by his failure to exercise it. This case is not one involving only the mutualization of a solvent insurer, since if it were, the shareholders would have the power to protect their interests by withholding their consent to the plan of mutualization. (Ins. Code, § 11526, subd. (b).) In fact, the business of an insolvent insurer is being mutualized pursuant to a rehabilitation agreement that has deprived the shareholders of the old company of the veto power they otherwise would have, and under the holding of the majority opinion they must look to the commissioner rather than to the court for the protection of their interests. (Ins. Code, §§ 11526, subd. (c), 11527.) Although the Legislature recognized that approval by the commissioner is sufficient when all of the interested parties are in a position to protect their own interests, it also provided that court approval is essential when they are not. (Ins. Code, § 1051.)

Despite the force of the foregoing considerations, if in fact the trial court in 1936 approved a rehabilitation agreement that not only provided for mutualization contrary to the statutory provisions but also restricted the power of that court to control the ultimate disposition of the assets in the hands of the commissioner as conservator or liquidator, I would reluctantly concur in the judgment on the ground that the validity of the agreement and order is res judicata. In my opinion, however, the court in 1936 did not exhaust its

power to control the disposition of assets in the hands of the commissioner as conservator or liquidator (see Ins. Code, § 1037, subd. (d)) and that therefore the commissioner cannot carry out the terms of the mutualization agreement until as liquidator he has secured the permission of the court in the insolvency proceedings. Accordingly, until he secures that approval he cannot approve the plan presented by the price determination committee as "fair and equitable in its operation" (Ins. Code, § 11527), for it cannot be known whether it will become operative at all until it is approved by the court in the insolvency proceedings.

Subdivision (d) of section 1037 provides "that no transaction involving real or personal property shall be made where the market value of the property involved exceeds the sum of one thousand dollars without first obtaining permission of . . . [the court in the insolvency proceedings], and then only in accordance with such terms as said court may prescribe." The stock of the new company subject to the plan of mutualization is personal property worth more than $1,000, and that plan is clearly a transaction involving such property. This section has not been complied with unless the court in approving the rehabilitation agreement granted permission to the commissioner to dispose of the stock under the terms of any mutualization agreement that might be proposed by the price determination committee 10 years or more in the future.

The order approving the rehabilitation agreement is ambiguous. Paragraph 15 provides:

"That the Insurance Commissioner of the State of California as Conservator of respondent corporation, or, if he should hereafter be appointed Liquidator of said corporation, as such Liquidator, be and is hereby authorized, without further order of this court, fully and faithfully to perform, carry out, and discharge each and all of the obligations, terms, conditions, and covenants on his part required to be performed under the terms of said Rehabilitation and Reinsurance Agreement; and, either with or without further order of this court, to make, do, execute, and deliver any and all such further or other acts, deeds, and things by him deemed reasonably necessary or desirable to effectuate the intents and purposes of said Rehabilitation and Reinsurance Agreement, and to assure and to confirm to Pacific Mutual Life Insurance Company, or its successors, all and singular the properties hereinbefore directed to be conveyed and released to said

corporation, and to enable said corporation from and after the date hereof to conduct and continue to conduct a life and disability insurance business, as contemplated by said agreement.''

Paragraph 16 provides:

''That this court, without relinquishing by these specific provisions any jurisdiction by it retained as a matter of law, do, and it does hereby, specifically retain and reserve jurisdiction of the within proceedings (for the purpose of authorizing or approving any act of the Insurance Commissioner of the State of California done, or to be done pursuant to or in accordance with this order, and) for the purpose of making or entering, upon application of the Insurance Commissioner of the State of California or of Pacific Mutual Life Insurance Company, any order, decree, judgment, or ruling required, permitted, or requested to be done, made, or entered in connection with or pursuant to the terms of said agreement, or for the effectuation of the purposes thereof.''

Since the contemplated plan of mutualization was not to be formulated for at least 10 years, the court could obviously not approve that plan at the time it entered its order approving the rehabilitation agreement. Moreover, it did not expressly approve in advance the carrying out of any mutualization plan that might be presented by the price determination committee. Although standing alone the language permitting the commissioner to carry out the rehabilitation agreement ''without further order of this court'' might be interpreted as exhausting the court's jurisdiction over mutualization, it may not reasonably be so interpreted in the light of the express reservation of jurisdiction ''for the purpose of making . . . any order . . . required . . . in connection with or pursuant to the terms of said agreement.'' It is significant that in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307, 322 [74 P.2d 761], this court was careful to note: ''The plan also provides that the commissioner, either as conservator or liquidator, shall continue to hold all the stock of the new company as a protection to all old company policyholders. Ultimate mutualization, in the event the policyholders so elect is also provided for. The trial court reserves jurisdiction over the entire proceeding.'' Paragraphs 15 and 16 may be reconciled by interpreting them as authorizing the commissioner without further order of the court to carry out the rehabilitation agreement to the extent that its provisions represented a completed plan for rehabilitation and

reinsurance, and at the same time reserving to the court jurisdiction to approve or disapprove plans to be developed in the future for mutualization or other disposal of the stock in the hands of the commissioner. Such an interpretation of the order subserves the primary purpose of section 1037, subdivision (d), and the statutes governing involuntary mutualization by securing to all interested parties their right to court scrutiny of all steps in the proceedings that substantially affect their rights, and since the order is reasonably susceptible of that interpretation it should be adopted. Although the validity of the rehabilitation agreement and the order approving it are res judicata, the interpretation of the order is not res judicata, and it should not be interpreted to sanction further departures from the statutory provisions than res judicata compels. (See *Watson* v. *Lawson,* 166 Cal. 235, 242 [135 P. 961]; *Treece* v. *Treece,* 125 Cal.App. 726, 728 [14 P.2d 95].)

The judgment should be reversed.

Schauer, J., concurred.

CARTER, J.—I dissent.

The majority opinion is a masterpiece of legal legerdemain. It approves a transaction whereby the policyholders of old company are deprived of between $18,000,000 and $24,000,000 to which they are entitled under any concept of law and justice. It also deprives the stockholders of old company of whatever value their stock in old company may be worth in view of the fact that the assets of old company which were transferred to new company at the time of its creation were valued in excess of over $200,000,000. The majority concedes that new company was created in an insolvency proceeding and has always been used in said proceeding as an agency of the insurance commissioner for the purpose of rehabilitating an insolvent insurance company, and that such proceeding is still pending because rehabilitation has not been completed. It nevertheless holds that "the new company is solvent and nondeliquent," even though it owes and is obligated to pay the policyholders of old company between $18,000,000 and $24,000,000 which it admittedly is not financially able to pay. In approving this transaction the majority disregards express statutory provisions of this state and deprives the stockholders and policyholders of old company of their right to a judicial review of the administrative proceeding whereby they were deprived of their property, thus denying them due process

of law to which they are entitled under both state and federal
constitutional provisions.

## THE UNDENIABLE FACTS

On July 22, 1936, some 3,000 stockholders and 300,000
policyholders of The Pacific Mutual Life Insurance Company
of California, hereinafter known as old company, were stunned
by the news that the insurance commissioner had taken charge
of the company, alleging it to be insolvent. This development
was all the more shocking because of its suddenness and also
because only a short time before, the regular, verified, annual
statement of the company showed it to be in sound financial
condition, as had similar previous statements from year to
year consistently shown throughout its lifetime of over 68
years. The business and assets of old company were then
taken over by the insurance commissioner of this state pur-
suant to the provisions of sections 1011 and 1013 of the Insur-
ance Code. Thereafter, The Pacific Mutual Life Insurance
Company was organized as part of a plan of rehabilitation
of old company by the commissioner who purchased its entire
capital stock with assets of old company. Pursuant to section
1043 of the Insurance Code, a "Rehabilitation and Reinsur-
ance" agreement was entered into between the new company
and the then insurance commissioner, as conservator of old
company. The rehabilitation plan provided for the organiza-
tion of a new corporation with a capital of $1,000,000 which
consisted of 10,000 shares at a par value of $100 each. The
commissioner was to purchase all the outstanding stock of
the new company with $3,000,000 in cash belonging to the old
company (which gave new company an initial surplus of
$2,000,000). The commissioner was then to transfer all the
other assets of old company (with the exception of the stock
of new company which, of course, was owned by old company)
to new company, and new company was to assume all policies
and obligations of the old company to the extent provided for
in the plan. The plan provided that new company would
assume all the obligations of the old company under existing
policies with the exception of the non-can policies, which
obligations were assumed on a reduced benefit schedule at
the old premium rates. It was agreed that further benefits
would be restored out of certain designated income of new
company. *All of new company's stock was purchased with
$3,000,000 out of old company's funds.* In addition, all the
other assets of old company (over $200,000,000 assets in addi-

tion to going agency organization and concern, good will, etc., "worth several millions of dollars" (*Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 325 [74 P.2d 761]) were transferred to new company. Therefore, new company owes its creation and existence to old company. The confiscatory nature of this entire proceeding, including the present majority holding, is at once apparent when we see that old company's stockholders will ultimately only receive $3,000,000 for their stock which, when old company was taken over, was supported by that amount in cash *plus* over $200,000,000 in various assets plus the value of good will, going business organization, etc., worth several millions of dollars! The agreement thus provided for a transfer to new company of the assets of old company (with certain exceptions not relevant here) and the assumption by new company of the obligations of old company, excluding certain noncancellable policies. With regard to these policies, known as the "non-can" policies, new company assumed a limited obligation and agreed to set up a special fund for the restoration of benefits thereunder. This obligation is still unpaid and outstanding. The capital stock of new company was to be held by the commissioner, as conservator, or liquidator, for the benefit of the creditors, policyholders, and stockholders of old company. On December 4, 1936, the agreement was approved by the trial court. In *Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 332, 334 [74 P.2d 761 (affirmed *Neblett* v. *Carpenter,* 305 U.S. 297 [59 S.Ct. 170, 83 L.Ed. 182]), it was held that the organization of new company, as part of a plan to rehabilitate the business of old company was proper. It is pointed out (p. 322) that "Ultimate mutualization, in the event the policyholders so elect is also provided for."

On February 2, 1937, an order was made providing for the liquidation of the old company and appointing the insurance commissioner as liquidator. This order was upheld on appeal (*Carpenter* v. *Pacific Mut. L. Ins. Co.,* 13 Cal.2d 306 [89 P.2d 637]), although old company has never been dissolved. On April 4, 1938, the commissioner, as liquidator, transferred title to the capital stock of new company to voting trustees. This transfer was upheld on appeal (*Caminetti* v. *Pacific Mut. L. Ins. Co.,* 22 Cal.2d 344 [139 P.2d 908]). (Other aspects of this case have been decided by this court in *Caminetti* v. *Pacific Mut. L. Ins. Co.,* 22 Cal.2d 77 [136 P.2d 779]; *Caminetti* v. *Pacific Mut. L. Ins. Co.,* 22 Cal.2d 386 [139 P.2d 930]; *Caminetti* v. *Pacific Mut. L. Ins.*

*Co.*, 23 Cal.2d 94 [142 P.2d 741]; *Neblett* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 393 [139 P.2d 934]; *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 14 Cal.2d 704 [96 P.2d 796]; and by the appellate courts in *Sanborn* v. *Pacific Mut. L. Ins. Co.*, 42 Cal.App.2d 99 [108 P.2d 458]; *Garrison* v. *Pacific Mut. L. Ins. Co.*, 83 Cal.App.2d 1 [187 P.2d 893].)

New company now seeks to acquire its stock (see later discussion) through the device of mutualization under section 20(a) of the rehabilitation agreement. The mutualization plan provides that the price to be paid for new company's stock is $3,000,000, with simple interest. If non-can benefits are fully restored prior to January 1, 1973, the purchase price is to be increased by an additional sum of $250,000 for each full year by which the date of completion of restoration precedes December, 1973. The purchase price is not absolutely payable, but is to be paid only "when and if" all the following conditions are met: (1) Non-can restoration is completed; (2) the funds in a special surplus fund (to be created pursuant to the plan) plus the capital and surplus of new company, equal or exceed the purchase price of the stock; (3) the *financial condition* of the *new company* is such that, after paying for and cancelling the stock, it would still have admitted assets in excess of all its liabilities amounting to the sum of 4 per cent of all admitted assets plus 25 per cent of the premiums collected during the preceding calendar year on all group insurance written on a one-year term basis and on all accident and health insurance.

This résumé shows that the new company was brought into existence as a creature of the state to rehabilitate old company and to carry on its business for that purpose. It also shows the grievous injustice being perpetuated by the majority in approving the plan of mutualization used here—that of *voluntary* mutualization of an *insolvent* corporation. This type of voluntary mutualization is as voluntary as a confession given under force, duress, and threats of bodily injury. Non-can benefits have not been fully restored; even under the mutualization plan it is contemplated they will not be fully restored (if partial benefit payments can be considered "full" restoration) until 1973. Until such time as they are restored, new company cannot be considered as a solvent concern since it still owes a debt to the policyholders and stockholders of old company, which it admittedly *cannot now pay*. The amount of this debt is conceded to be between $18,000,000 and $24,000,000. How can it then be said, with any degree

of honesty whatsoever, that new company is solvent and may avail itself of the statutory provisions relating to mutualization? I defy anyone to give an affirmative answer to this question.

### PRESENT PROCEEDING

Purporting to act under paragraph 20(a) of the rehabilitation and reinsurance agreement, a plan of mutualization was formulated by the committee and, on September 22, 1950, the insurance commissioner found that the plan protected the rights and interests of new company, its policyholders and shareholders, and that he was satisfied that the plan would be fair and equitable in its operation.

Paragraph 20(a) of the rehabilitation and reinsurance agreement provides:

"Mutualization and Disposition of Stock of New Company

"(2) Neither the Conservator, nor, if one be appointed, the Liquidator, of the Old Company, shall dispose of any of the stock of the New Company except as follows:

"(a) At any time between July 1, 1946 and January 1, 1948, and thereafter so long as the Conservator or a Liquidator of the Old Company may continue to hold any or all of said stock, ten percent (10%) of the holders of participating policies of life insurance entitled to vote at a policy holders' election on a proposal for *voluntary* mutualization of the New Company, whether those re-insured hereunder or those issued by the New Company (each policy holder for this purpose being regarded as one person regardless of the number of policies owned or amount of insurance held) may request the New Company to create an Appointing Committee as hereinafter provided to exercise the duties and functions hereinafter specified in respect of a proposed *voluntary* mutualization of the New Company, in accordance with the laws of the State of California in effect at the time of said request, or, if said laws then so permit, of any one or more departments thereof. Such request shall specify the department or departments of the New Company desired to be mutualized.

"Upon the receipt of such request the New Company shall create an Appointing Committee consisting of the then President of the Association of Life Insurance Presidents, the President of Leland Stanford Jr. University, and the Provost of the University of California at Los Angeles, or persons occupying similar positions if their or any of their titles shall have been changed. In the event any one or more of such persons shall refuse or be unable to act, the remaining

member or members shall fill the vacancy or vacancies thereby created by their appointment in writing of another person or persons of similar position and standing. If all of said persons refuse or are unable to act, the Court or any Judge thereof shall, on the application of the Commissioner, designate an Appointing Committee consisting of three (3) persons of similar position and standing. Said Appointing Committee, acting through not less than a majority of its members, shall designate a Price Determination Committee of not less than three and not more than five (5) persons skilled in matters of insurance company valuation, which committee, acting through not less than a majority thereof, shall determine whether in their opinion the proposed *voluntary* mutualization of the New Company, or of the department or departments thereof specified in said request can then be practicably accomplished *having due regard to the interests of all persons interested in the New Company.** If it can be determined that such mutualization is not then practicable no further steps shall be taken in connection with a possible mutualization of the New Company under the provisions of this subparagraph until at least six months after the date of such determination. If in the opinion of a majority of the members of the committee such mutualization is then practicable, the committee shall determine the proper price to be paid upon such mutualization and appropriate terms of payments thereof; said determination shall not be made, however, prior to January 1, 1947.

"If, at the date of the appointment of such committee the New Company shall have in force Participating Life Insurance written. subsequent to the effective date of this agreement in an amount in excess of its Non-Participating Life Insurance written during the same period, one-half ($\frac{1}{2}$) of such excess shall, for the purpose of fixing the proper price to be paid (but for no other purpose) be deemed to be, and shall be valued as, Non-Participating Life Insurance. If at the time of such appointment, there shall have been transferred from the Participating Department in accordance with the provisions of sub-paragraph (d) of paragraph 6 hereof, less than ten percent (10%) of the then accrued earnings described therein, or if there shall have been transferred to the Participating Department any working capital pursuant to the provisions of subparagraph (c) of said para-

---

*The statutory scheme relating to insolvent companies is concerned with the protection of those interested in the *insolvent* company.

graph 6, any unpaid balance thereof shall, for the purpose of fixing the proper price to be paid (but for no other purpose) be deemed to be a debt then due and matured. Said Committee shall in its report to the New Company include a plan of mutualization of the New Company, or of the department or departments thereof specified in said request of the policy holders. Such plan shall specify, in addition to any other relevant matters, the price to be paid, the terms of payment, and the persons by whom and the manner in which the right to vote the stock of the New Company is to be exercised pending complete payment of the purchase price. In this connection the said Committee, if it deem it advisable, may provide in the plan for the creation of a voting trust, designate the initial trustees, and make provision for the appointment of their successors. Unless the benefits under Non-Can policies have theretofore been fully restored and claims against the Liquidator fully paid, such plan shall further provide that such mutualization shall not affect the provisions of paragraph 17 or of paragraph 14 hereof or the right of holders of Non-Can Policies to the restoration of benefits from the sources and in the manner therein provided.

"The New Company agrees that within sixty (60) days after the making of such report (unless said report shall be to the effect that mutualization is not then practicable) it will mail copies thereof to all of its policy holders entitled to vote upon such plan or plans of mutualization if submitted according to law. If within one hundred twenty (120) days after the mailing of such notice, ten per cent. (10%) of the policy holders entitled to vote upon any such plan or plans (each policy holder being for this purpose regarded as one person regardless of the number of policies owned or amount of insurance held) shall request in writing the submission thereof, the New Company will promptly submit the same in accordance with the laws of the State of California then in effect. The Conservator for himself and for any successors in the ownership of said stock claiming under him in any manner other than through a sale of said stock pursuant to the provisions of subparagraph (d) hereof agrees to consent and hereby consents as the holder and owner of the stock of the New Company to such plan of mutualization. In the event said mutualization plan is adopted, the Conservator, or a liquidator as aforesaid, shall dispose of such stock in accordance with such plan. The expenses of the foregoing proceedings including costs, fees and expenses of the Price Deter-

mination Committee, shall be borne by the New Company, and unless the proposed plan of mutualization is consummated, shall be charged to the Participating Department thereof.

"In the event the Price Determination Committee has been appointed as herein provided prior to January 1, 1948, said Committee shall have the power to extend the time within which mutualization may be effected hereunder for such period or periods of time as it may deem necessary for the orderly completion of mutualization proceedings as herein ordered." (Emphasis added.)

### MUTUALIZATION

The Insurance Code provides for mutualization of insurance companies in two different ways. Division 1, part 2, chapter 1, article 14, sections 1010-1062, entitled "Proceedings in Cases of Insolvency and Delinquency" provides in section 1043 for "Mutualization, reinsurance and rehabilitation." Division 2, part 2, chapter 13, article 1, sections 11525-11533, entitled "Voluntary Mutualization of Incorporated Life and Life and Disability Insurers Having a Capital Stock and Issuing Nonassessable Policies on a Reserve Basis" provides in sections 11525 and 11526 the "Authorization to mutualize" and the "Method of mutualization."

There is no dispute concerning the method actually used in this proceeding. The rehabilitation plan provided for "voluntary" mutualization and the matter proceeded under sections 11525 and 11526. There is complete disagreement as to which method should have been used. Appellants correctly contend that the procedure outlined for "involuntary" mutualization of an "insolvent" insurer is the only proper method.

As stated in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307, 328 [74 P.2d 761], ". . . the proceedings here under review were taken under sections 1010 to 1061 of the Insurance Code, adopted in 1935." (The other cases heretofore cited have reiterated this statement.) The original seizure of old company was accomplished under section 1011, subdivision (d). Section 1045 provides *"Mutualization of life insurer issuing nonassessable policies on a reverse basis: Formation of plan.* If at any time *after the issuance of an order under section 1011* affecting a life insurer issuing nonassessable policies on a reserve basis and organized with a capital stock evidenced by shares thereof *it shall appear to the commissioner that the purposes of section 1011 can be best attained*

*by the mutualization of such life insurer, the commissioner may formulate a plan for the mutualization of such insurer.''* (Emphasis added.)

*All* proceedings heretofore had in this litigation have been as provided for in article 14 relating to insolvent and delinquent insurers. The rehabilitation agreement provides for mutualization under the statutory scheme set up for solvent insurers. The majority opinion states ''The new company is solvent and nondelinquent, and there is no sound reason why it should be mutualized under the statutes relating to insolvent insurers. . . . Section 1043 [which relates to insolvents], which authorizes the commissioner to enter into rehabilitation agreements, contains no express limitation on what may be included in them, and section 1037 [which also relates to insolvents] provides that the enumeration of the powers of the commissioner shall not be construed as a limitation upon him or upon his right to do such other acts as he may deem necessary in connection with the handling of the affairs of an *insolvent company.*'' (Emphasis added.) Thus the majority opinion admits the procedure relating to insolvents was the one used and impliedly admits that it is the correct procedure. However, in using the code sections relating to insolvents, the author then argues that these sections place no limitation upon the commissioner. Section 1037 provides that the powers and authority of the commissioner in proceedings *''under this article''* (which relates to insolvents) shall not be construed as a limitation on his right to act or to do that ''which he may deem necessary or expedient for the accomplishment or in aid of the purpose of *such proceedings.*'' Then, citing section 1043 (relating again to insolvents), we are told that the new company was properly organized by the commissioner who ''evidently concluded'' that the protection of creditors and ''other interested parties'' could best be accomplished through the formation of a new company ''divorced as far as possible from the control of those who were in charge of the old company when it experienced financial difficulties.'' Then we are told that the new company is a separate and distinct entity. We are told this without any discussion of the character of new company, and with only the unreasoned and unsupported dictum in *Garrison* v. *Pacific Mut. L. Ins. Co.,* 83 Cal.App.2d 1, 9-10 [187 P.2d 893], as authority therefor.

Section 11525 (the procedure followed here) provides for *''Authorization to mutualize. A solvent* domestic incorpo-

rated insurer having a paid-in capital represented by outstanding shares of capital stock and issuing, on a reserve basis, nonassessable policies of life insurance or of both life and disability insurance, *may convert itself into an incorporated mutual life insurer,* or life and disability insurer, issuing nonassessable policies on a reserve basis. To that end *it may provide and carry out a plan for the acquisition of the outstanding shares of its capital stock for the benefit of its policyholders,* or any class or classes of its policyholders, by complying with the requirements of this chapter." (Emphasis added.)

The question is thus directly posed as to whether new company falls within the classification of a "solvent" domestic incorporated insurer which "may convert itself into an incorporated mutual life insurer" which "may provide and carry out a plan for the acquisition of the outstanding shares of its capital stock for the benefit of its policyholders."

### CHARACTER OF NEW COMPANY

New company was organized by the insurance commissioner "with a name similar to that of the old company as a corporate agent to assist him in carrying on the business of the old company" (*Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 324, 325 [74 P.2d 761]). It was also said there (p. 327) that "The proceeding was had under sections 1010 to 1061 of the Insurance Code which specially deal with the rehabilitation and liquidation of insurance companies. Those sections set up a comprehensive statutory scheme to accomplish those results. The proceeding is not one in which another party is prosecuting another party at all. It is simply a proceeding in which the state is invoking its power over a corporate entity permitted by the state to engage in a business vitally affected with the public interest upon condition of continuing compliance with the requirements provided by the state. It is not a controversy between private parties but a proceeding by the state in the interest of the public." See also *Caminetti* v. *Pacific Mut. L. Ins. Co.,* 22 Cal.2d 77, 82 [136 P.2d 779], where it was held that *"The new company was the corporate agency of the Insurance Commissioner as conservator for the purpose of continuing and preserving the business of the old company."* (Emphasis added.)

The commissioner held, either as conservator or later as liquidator, the entire capital stock of new company until

1938 when it was transferred to voting trustees (*Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344, 356 [139 P.2d 908]). It was there said that "The affairs of the new company are placed in charge of a board of directors to whom the agreement expressly confides a large measure of discretion. *Supervisory powers, however, are reserved to the commissioner,* independent of and in addition to his statutory powers over delinquent insurance companies. For example, no investment or reinvestment of the assets of the old company may be made without written approval of the commissioner. Payments to the restoration fund for non-can policies are subject to the approval of the commissioner who, in addition, may require further payments thereto. The determination by the board of directors of the apportionment of expenses and the exchange of assets among the several departments of the new company is subject to adjustment by the commissioner. Reserves against policies of the old company subject to assumption or reinsurance under the agreement were to be established by the new company *with the approval of and in accordance with the requirements of the commissioner.* While as holder of the stock the commissioner possessed the voting rights incident thereto, the agreement contains no express provision with respect to the exercise of the voting power. . . .

"The trustees are given legal title to the stock of the new company with the power to exercise all the rights of ownership. *The commissioner, however, retains the entire beneficial interest for the benefit of creditors of the old company and others interested. The voting trust undertakes to transfer to the trustees only administrative duties relating to the stock, principally the right to vote the same. . . .*" (Emphasis added.)

New company does not possess the characteristics of a solvent company as that term is generally understood. First, it was organized as the *agent* of the *commissioner* to *rehabilitate* the *business* of the *old company.* It may be, as was said in the Garrison case, that it is a distinct entity without detracting in the least from the fact that it is still an agent for the purpose of rehabilitating the old company. An agent, or servant, is usually a distinct entity, but the duties and activities of such agent or servant, are carried out to serve the purposes of the principal. In other words, the agent acts for the principal, not for himself, or itself. Does the insurance commissioner ordinarily, and customarily, hold all the stock of a solvent insurance company? Does the insurance commis-

sioner ordinarily, and customarily, have reserved to himself supervisory powers, "independent of and in addition to his statutory powers" where a solvent company is concerned? Does an insurance commissioner ordinarily, and customarily, give his written approval of the investment or reinvestment of funds of a solvent insurance company? Does the insurance commissioner ordinarily, and customarily, tell the board of directors of a solvent company when and how they must apportion expenses and exchange assets among its several departments? In the case of new company, the commissioner does all of those things. (See Chief Justice Gibson's opinion in *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344, 356 [139 P.2d 908].)

New company would have no existence had it not been for the technical insolvency of old company. No new money constituted the assets of new company which was organized with the assets of old company. If new company were a solvent independent and distinct corporation, the insurance commissioner would not be holding its stock for the policyholders of old company. The stockholders of new company would be holding their own stock supported by assets in the hands of the officers and directors of the company. Section 11525 provides that "A solvent domestic incorporated insurer [is one] having a paid-in capital represented by outstanding shares of capital stock and issuing, on a reserve basis, nonassessable policies of life insurance or of both life and disability insurance. . . ." Surely in the normal case, "outstanding shares of capital stock" refers to stock held by stockholders, *not* by the commissioner!

Mr. Justice Traynor has pointed out how the use of the solvent mutualization procedure has deprived the members of old company of their right to the protection of court scrutiny of the plan of mutualization. He shows how the procedure used here cannot apply to the facts of the case because in the ordinary case of a voluntary mutualization, the shareholders would have the power to protect their interests by withholding their consent to the plan of mutualization. The sections of the code which relate to mutualization of insolvent companies were clearly intended by the Legislature to protect the interests of the interested parties by providing for court approval.

In the present case by the use of the procedure provided for in the case of a solvent company, the commissioner approves a plan to be formulated in the future. When that plan

is formulated, as holder of all the stock, he votes for the plan. Then, as commissioner, he approves the plan as fair and equitable. We are told by the majority opinion that "it must be assumed that the Legislature realized that the commissioner might be required to pass upon the fairness of a plan in a case where he, acting as conservator, had previously consented to mutualization on behalf of the stockholders." Nothing of the kind must be assumed. It is obvious from even a casual reading of the code provisions relating to insolvent companies (1043 et seq.) and those relating to solvent companies (11525 et seq.) that the Legislature had not the faintest thought that the two would be so commingled as they are in this case, or that the commissioner would be placed in a position where he was forced to approve a plan to be formulated some 10 years in the future, then, when the plan was formulated forced to vote an approval of it as a sole stockholder, and still later, to give his approval of something he had theretofore twice before approved.

Ever since the inception* of the receivership proceedings and the organization of new company all the parties and proceedings concerned in the rehabilitation matter have been subject to the continuing jurisdiction and supervision of the court. It has been pointed out in various phases of this litigation that new company was organized by the commissioner as his *corporate agent* to rehabilitate the business of old company. Without the original proceeding under section 1011 (d) of the Insurance Code, new company would not have come into being.

It is necessary, next, to note the difference in methods provided for in the two divisions of the Insurance Code for mutualization of insolvent and solvent companies.

Section 1046 provides that "Said mutualization plan [called involuntary mutualization for insolvent companies and follows the section (1045) which provides: "If *at any time after the issuance of an order under section 1011*" the "*commissioner*" shall formulate a plan of mutualization] *shall* include provisions for:

"(a) [Acquisition of capital stock.] The acquisition by such insurer of all outstanding shares of its capital stock at a price and upon terms and conditions to be fixed as hereinafter provided.

---

*(With the exception of the present proceeding to be hereinafter discussed.)

"(b) [Retirement of capital stock.] The retirement of said shares of stock when acquired by such insurer.

"(c) [Amendment of charter.] The amendment of the charter of such insurer so as to enable it to transact its business as a mutual insurer issuing nonassessable policies on a reserve basis.

"(d) [Payment of claims.] The manner in which and the time within which, after mutualization is effected, matured and maturing claims against such insurer shall be paid to the lawful holders thereof.

"(e) [Submission of plan to policyholders.] The submission of said mutualization plan to the policyholders of such insurer under such procedure as shall be set forth in the plan or prescribed by said court, for their approval or rejection.

"(f) [Notice to shareholders.] Notice to the shareholders of such insurer, in such manner and at such time after the approval of said mutualization plan by said policyholders, as the court may direct."

Section 1048 provides that after the formulation of the mutualization plan, the commissioner shall submit it to the court for its order directing the submission thereof to the policyholders named in subdivision (e), of section 1046.

Section 11526 (relating to *solvent* insurers) provides that "Such plan shall include appropriate proceedings for amending the insurer's articles of incorporation to give effect to the acquisition, by said insurer, for the benefit of its policyholders or any class or classes thereof, of the outstanding shares of its capital stock and the conversion of the insurer from a stock corporation into a nonstock corporation for the benefit of its members. The members of such nonstock corporation shall be the policyholders from time to time of the class or classes for whose benefit the stock of the insurer was acquired, and no other persons. Such plan shall be:

"(a) Adopted by a vote of a majority of the directors. [As distinguished from the formation thereof by the commissioner as provided in section 1045.]

"(b) Approved by the vote of the holders of at least a majority of the outstanding shares at a special meeting of *shareholders* called for that purpose, or by the written consent of such shareholders. [As distinguished from section 1048 requiring the commissioner to obtain court approval and an order of the court directing the submission of the plan to the policyholders.]

"(c) Submitted to the commissioner and approved by him

in writing. [Under the circumstances here prevailing with regard to the commissioner's position as conservator, liquidator and general supervisor of new company, this amounts to an idle act.]

"(d) Approved by a majority vote of all the *policyholders* of the class or classes for whose benefit the stock is to be acquired voting at an election by the policyholders called for that purpose, subject to the provisions of section 11528. . . .

"(e) Filed in the office of the Insurance Commissioner after having been approved as provided in subdivisions (b), (c) and (d) of this section."

Under the provisions of the rehabilitation agreement, a price determination committee consisting of four members was set up. The price determination committee reported to new company, in April, 1950, that mutualization was practicable and valued the stock of new company at $3,000,000. The mutualization plan provided in part for the payment of the purchase price with simple interest at the rate of long term government bonds (2½%). Under the terms of the rehabilitation agreement, "The Conservator for himself and for any successors in the ownership of said stock claiming under him in any manner other than through a sale of said stock pursuant to the provisions of sub-paragraph (d) hereof agrees to consent and hereby consents as the holder and owner of the stock of the New Company to such plan of mutualization. In the event said mutualization plan is adopted, the Conservator, or a Liquidator as aforesaid, shall dispose of such stock in accordance with such plan."

Under the voluntary mutualization procedure heretofore set forth (section 11526) the mutualization plan is submitted to the commissioner after adoption by a vote of a majority of the directors and after a vote by a majority of the outstanding shares at a special meeting of shareholders called for that purpose. Section 11527 provides that "The Commissioner shall examine the plan submitted to him under the provisions of subdivision (c) of section 11526. *He shall not approve such plan unless in his opinion the rights and interests of the insurer, its policyholders and shareholders are protected nor unless he is satisfied that the plan will be fair and equitable in its operation.*" (Emphasis added.) Fair and equitable to *which* company?

Under the provision of the rehabilitation agreement heretofore set forth, the then commissioner agreed for himself, and his successors, to agree to any plan promulgated by the

price determination committee. It should be borne in mind that the stock of new company is now held by voting trustees who had no discretion, but were (as stated in the insurance commissioner's answering brief, p. 73) "not only *authorized,* but *bound* to give their consent; and [that] they had no discretion to exercise." (Emphasis that of the commissioner.) There is evidence in the record which shows that the trustees voted for the plan of mutualization because they were told to so vote; that they did not examine into the merits of the plan. The next step provided for in section 11526 (Ins. Code) is that the plan shall be submitted to the commissioner for his written approval. The insurance commissioner states (Answering brief, p. 83), "As we have already shown, the Liquidator [commissioner] has bound himself to consent to a Plan of Mutualization proposed in accordance with the Rehabilitation Agreement." The code, however, (§ 11527) provides that the commissioner shall examine the plan submitted to him under the provisions of subdivision (c) of section 11526 and that *"He shall not approve such plan unless in his opinion the rights and interests of the insurer, its policyholders and shareholders are protected nor unless he is satisfied that the plan will be fair and equitable in its operation."* (Emphasis added.) The net result, under the circumstances prevailing in this case, is that the commissioner, as beneficial owner of all the stock of the new company, instructs the voting trustees to vote for any plan proposed by the price determination committee and then, when such plan is submitted to him for his approval, places his rubber stamp of approval thereon because he (or his predecessor) has, 10 years prior to the promulgation of the plan, agreed to approve it *no matter what it is*—agreed, not only for himself, but for any successor in office, to approve the plan as proposed. It is shown, therefore, without a shadow of a doubt, that the earlier agreement to approve any plan proposed by the price determination committee has the effect of nullifying section 11527 of the Insurance Code, as well as the sections relating to mutualization of insolvent insurers.

Had the procedure outlined in sections 1045, 1046 and 1048 been followed, the result would be very different. Under section 1045 the *commissioner* would formulate the mutualization plan for the purpose of carrying out the rehabilitation of the insurer whose business was seized under the provisions of section 1011. The commissioner's plan would then be submitted to the court for its order directing the submission of

the mutualization plan to the shareholders and policyholders of the seized insurer for their vote of approval, or disapproval as the case might be (§ 1046, subds. (e) and (f)). Old company, not having been dissolved, still exists; new company was organized as the corporate agent of the commissioner to rehabilitate the business of old company with the assets of old company. New company cannot, as it appears, be considered as a completely independent and solvent organization under the facts here prevailing. As I have pointed out, the commissioner holds the entire beneficial interest in all the capital stock of new company for the benefit of stockholders, policyholders and creditors of old company; the legal title to the stock of new company is held by voting trustees who vote it as directed by the commissioner. As I have also pointed out, the board of directors of new company are under the close supervision, control and direction of the commissioner and must, in reality, take orders from him as to every major, and some minor, business details. It cannot be said that this close supervision, control and direction exist in the usual "solvent" corporation.

### CORPORATE ENTITY OF NEW COMPANY

Respondents argue that the corporate entity of new company cannot be disregarded so as to make the proposed mutualization a mutualization of old company. In support of this contention, *In re Bond & Mortg. Guar. Corp.*, 157 Misc. 240 [283 N.Y.S. 623, 652], and *Garrison* v. *Pacific Mut. L. Ins. Co.*, 83 Cal.App.2d 1, 9-10 [187 P.2d 893], are cited. In neither case was mutualization involved. In the Bond & Mortgage Guarantee case, the superintendent of insurance had organized Bond & Mortgage Guarantee *Corporation* "as a domestic insurance corporation, with a capital of $1,000,000, a surplus of $2,000,000, and a reserve for contingencies of $200,000, all of which was paid out of the assets of the guarantee *company* in exchange for the entire capital stock of the new corporation, 10,000 shares of the par value of $100 each; a certificate for said number of shares was issued in the name of the guarantee *company* and is held by the superintendent of insurance as an asset, for the benefit of the creditors (including the policyholders), of the guarantee *company*." (Emphasis added.) The guarantee corporation here involved took on the duty of insuring mortgages, "but on a restricted basis under a limited policy of guaranty." (Pp. 641, 650.) This case involved a proceeding whereby the People, and certain individuals interested, applied for an order enjoining the

State Mortgage Commission from demanding and receiving or assuming control of certain mortgages being serviced by the guarantee *corporation* pursuant to court order. The injunction was granted. The contention was that the guarantee corporation, in servicing mortgages, was acting without adequate corporate powers. The court held that the corporation was acting within its corporate authority and, in answer to the contention that the guarantee corporation was a state agency inseparable from the superintendent of insurance (so as to permit another state agency, the Mortgage Commission, which came into being *after* the proceedings set forth had been had) to take it over, the court said: "Said corporation is like any other corporation; a distinct entity. All of its stock is owned by guarantee *company,* and the certificate therefor is held in the custody of the superintendent; this he holds as he does any other assets of the company in rehabilitation, as a receiver designated by statute for the benefit of the creditors and stockholders of said company; not as an owner, representing the state. It is a stock corporation, having been created, for one thing, *with a view to its possible sale for the benefit of the creditors, as its exhaustive by-laws make apparent.* During such time as the stock control remains as it is, the operation of the corporation is to be under the supervision of the superintendent as rehabilitator." (Emphasis added.) The court continued and said that the primary management of the corporation was with the board of directors, although it was subject to the supervision of the superintendent "in his capacity as supervisor of insurance companies" (pp. 651, 652). The situation presented in the New York case and that presented in the case at bar are factually similar up to a point. I have heretofore quoted extensively from *Caminetti* v. *Pacific Mut. L. Ins. Co.;* 22 Cal.2d 344, at page 356 [139 P.2d 908], wherein we set forth the extensive and minute supervision exercised by the commissioner over new company. This supervision exceeded by far anything required of him as "supervisor of insurance companies." We also said in *Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 324, 325 [74 P.2d 761], that new company was organized "as a corporate agent to assist him [commissioner] in carrying on the business of the old company." (See also *Caminetti* v. *Pacific Mut. L. Ins. Co.,* 22 Cal.2d 77, 80 [136 P.2d 779].)

In *Garrison* v. *Pacific Mut. L. Ins. Co.,* 83 Cal.App.2d 1 [187 P.2d 893], the court said, "The question for decision is whether an insurance company which was organized to

conserve an insolvent insurance company and to rehabilitate its business is obligated to pay interest on claims allowed by the conservator against such insolvent, based upon the breach by the latter of certain policies, in the absence from the rehabilitation agreement of a specific promise to pay such interest, the agreement having provided for the payment to the liquidator for the benefit of such claimants an amount equal to the sum of all 'allowed claims' against the insolvent company.'' New company, by the terms of the rehabilitation agreement had agreed (Paragraph 17) ''to pay to the liquidator for payment to claimants an amount equal to the sum of all claims against old company filed with the liquidator and finally allowed.'' The court answered the question put with this statement: ''It is customary practice in liquidation proceedings to marshal the assets of the debtor, fix the amount of its liabilities and disburse the assets among the creditors pro rata. Such a process would not be possible, if during the season of liquidation, the claims should be varied by the additions of varying amounts of interest.'' (P. 9.) Respondents rely upon the following paragraph from the opinion of the District Court in the Garrison case: ''Appellants contend that new company is a reincarnation of old company and, therefore, has impliedly promised to pay all of the latter's indebtedness. In this they ignore provisions of the Insurance Code, article 14 of chapter 1, part 2, division 1, which article deals with insolvency and liquidation proceedings. Section 1043 of such article provides that in any proceeding under the article, *the commissioner may mutualize or reinsure the business of any person* affected by proceedings thereunder and may enter into rehabilitation agreements. *New company was organized by the sovereign power for the purpose of rehabilitating the business of one of its own creatures whose very existence inhered in the blood and sweat of the people.* It was to go forward under the guidance of the state. Its identity is utterly distinct from that of old company, notwithstanding the latter's equitable ownership of new company's stock. It cannot be fairly said that it is a continuance of old company. It did not take over the latter's assets or assume its burdens at the behest of old company. Such transfer and assumption were rendered indispensable to the public weal and were required by law to conserve the common good in general and the army of policyholders of old company in particular. New company was not organized by old company to do service in a prescribed manner for the latter but was created by the state

to perform a public service. It must be and act in its own right upon the arena of trade and commerce and of human existence, free from the fetters of a collapsed institution which in the kaleidoscope of a changing world will soon be only a memory." (Pp. 9, 10.) New company was organized by the state to rehabilitate the business of old company; as the "corporate agent" of the insurance commissioner for that purpose. The language just quoted is, in part, illogical under the facts presented in this long line of litigation, including the Garrison case. It appears to me that the statement that "its [new company] identity is *utterly* distinct" is inconsistent with the latter part of the same sentence that this was so "notwithstanding the latter's [old company] equitable ownership of new company's stock" and with one of the preceding sentences wherein it is said that "New company was organized by the sovereign power for the purpose of rehabilitating the business of" old company, and the fact that new company "was to go forward under the guidance of the state." The duties and obligations imposed upon the commissioner in this case amount to far more than his usual supervision of the usual solvent insurance company. There can be no doubt that new company is a separate *corporate* agency and that it was not organized by old company, but it does not logically follow that it is "utterly distinct" from old company. In my opinion, new company would have no existence but for the insolvency proceedings against old company. It also conclusively appears that the quoted statement from the Garrison case is dictum since it had nothing to do with the question involved there.

Respondents also argue that because this court said in *Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 334 [74 P.2d 761], that new company was, as a reinsurer, "substituted as an insurer in the place and stead of the original insurer" that the corporate identity of new company cannot be disregarded; that because this court said in the Carpenter case (p. 335) that "Every policyholder who consents to the Plan clearly enters into a novation with the New Company" that the two companies cannot be considered as "essentially one and the same." New company will in time replace old company but so long as old company exists *in any form,* it is clear that new company is still *only the corporate agent* of the commissioner for the purpose of rehabilitating the business of old company and that the mutualization plan must be worked out in accordance with the procedure provided for

in that part of the Insurance Code relating to involuntary mutualization of insolvent companies. The stock of new company, held now by voting trustees, with beneficial ownership in the commissioner is still held by him for the benefit of the policyholders and creditors of old company. This fact cannot be disregarded; nor can the rights of the policyholders and creditors of old company be disregarded. In holding that new company is "utterly distinct" from old company for *all purposes*, a majority of this court chooses to forget *all the facts* concerning this litigation and pretends that new company was organized as any other insurance company with its own assets and liabilities, that the insurance commissioner had only the normal, nominal, supervision over its affairs, and that no insolvency proceedings had ever been involved. In the light of the record before us, such a holding cannot stand the test of honest scrutiny.

## Res Judicata

Respondents argue that it has been decided by the superior court that the commissioner had authority to include in a rehabilitation agreement an option to mutualize the new company by voluntary proceedings and to agree to dispose of the stock of new company at the price, and on the terms, fixed by the price determination committee; and that this court has decided that the superior court had jurisdiction to so decide and that the superior court did not abuse its discretion in approving the rehabilitation agreement.

In the commissioner's answering brief (p. 61) is found this statement: "It is true that no attack seems to have been made on the mutualization provisions [of the rehabilitation agreement] in any of the appellate proceedings, but the courts have taken notice of them in determining various appeals." Neither this court, nor an appellate court, has been concerned in any of this litigation with the mutualization provisions of the rehabilitation agreement as will hereinafter appear.

In *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307, 322 [74 P.2d 761], we said that the plan of rehabilitation provided for "Ultimate mutualization, in the event the policyholders so elect." We were there concerned in the main with the organization of new company as the corporate agent of the commissioner to rehabilitate the business of old company. In *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 13 Cal.2d 306 [89 P.2d 637], we were concerned with the validity of the "Order for Liquidation" and the mutualization provisions of the plan were not considered. In *Carpenter* v. *Pacific Mut. L. Ins. Co.*,

14 Cal.2d 704 [96 P.2d 796], we were concerned with an order of the trial court correcting its minutes, *nunc pro tunc*. In *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 77 [136 P.2d 779], we were concerned with the claims of dissenting policyholders and, once again, the mutualization provisions were not considered. In *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 344, 353 [139 P.2d 908], we were concerned with the propriety of creating a voting trust with the stock of new company under the provisions of section 1037, subdivision (e), of the Insurance Code. We said there that ''To adopt the contention that section 1037(e) was not intended to apply to stock of an insurance company *organized as a medium through which rehabilitation of the business of a delinquent insurer was to be accomplished would require us to disregard the clear language of the statute.* Section 1037(e) specifically refers to stock issued to the commissioner 'as conservator or as liquidator in connection with a rehabilitation or reinsurance agreement.' '' (Emphasis added.) We also said there (p. 355) that the rehabilitation agreement (Paragraph 20) related to the ''ultimate status and ownership of the new company.'' We then pointed out that subdivision (a) (Paragraph 20) authorizes the commissioner to dispose of the stock in accordance with ''any plan of mutualization thereafter adopted by the policyholders of the new company, and such a disposition may include a transfer to voting trustees if the plan of mutualization so provides.'' We held that the voting trust agreement was not a disposal of the stock within the meaning or purpose of Paragraph 20 of the rehabilitation agreement and we said (p. 358) that ''It is true that the words 'dispose of' are used in subdivision (a) of paragraph 20 in connection with an authorization to the commissioner to transfer the stock of the new company to voting trustees in accordance with a plan of mutualization. *But it is clear that under that subdivision the transfer there provided for would require a complete alienation of the stock in order* to carry out the plan of mutualization contemplated therein.'' (Emphasis added.) Again, the validity of the mutualization procedure was not passed upon; the only holding being that the rehabilitation agreement did not preclude the creation of the voting trust. In *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d 386 [139 P.2d 930], we were concerned with disqualification of a judge and a party's waiver thereof. Mutualization was not considered. In *Caminetti* v. *Pacific Mut. L. Ins. Co.*, 23 Cal.2d 94 [142 P.2d 741], we were concerned with the correctness of the

measure of damages adopted by the commissioner to be allowed disability policyholders. In *Garrison* v. *Pacific Mut. L. Ins. Co.*, 83 Cal.App.2d 1 [187 P.2d 893], the court was concerned with the question of interest on claims allowed by the commissioner. In *Sanborn* v. *Pacific Mut. L. Ins. Co.*, 42 Cal. App.2d 99 [108 P.2d 458], the court pointed out that the following questions were involved: What was the effective date of the agreement between new company and the insurance commissioner as conservator of old company? Did appellant's present disability commence prior to such date and was notice of claim filed in accordance with the agreement?

It is contended by respondents, however, that a judgment upholding the validity of a contract establishes its validity, not only against the attacks actually made, but against those that could have been made, even though no question of invalidity was raised in the original proceeding and even though the judgment does not expressly pass on the contract.

Appellants argue that the procedure for mutualization provided for by statute cannot be altered by contract and that any attempt to do so is against public policy, illegal and void. It is true, of course, that the plan of mutualization, as proposed by the price determination committee, has never been before the courts until the present proceeding. The trial court, in its order of December 4, 1936, stated (13) ''That said Rehabilitation and Reinsurance Agreement, and each and all of the terms and conditions thereof, and the plan therein embodied are, and each of them is, hereby approved; . . .'' (Clk. Tr., p. 169.) This was an approval *only* of the agreement and, while grossly wrong, does not now preclude this court from correcting the error since the *plan* of *mutualization* was not passed upon *nor could it have been* since it was to be promulgated *10* years in the future.

We said in the Caminetti case (22 Cal.2d 344, 363) ''This proceeding is wholly statutory. The duties imposed upon the commissioner, and the supervision over him vested in the courts, result from the statute.'' Appellants, citing *Fortenbury* v. *Superior Court*, 16 Cal.2d 405, 407-408 [106 P.2d 411], contend that if the order of the trial court (December 4, 1936) is considered as having approved a plan of mutualization contrary to the statutory provisions therefor, it is void for want of jurisdiction of the subject matter. The respondents' position is that this court having previously determined the trial court's jurisdiction, the matter is res judicata. In the Fortenbury case, we said ''The term jurisdiction originally

included only the right to hear and determine concerning the subject matter in a particular case. But the modern tendency has been to broaden the meaning, particularly where the right to review a decision by certiorari, or other prerogative writ is the question for decision. *A court may have jurisdiction of the cause of action and of the parties, but it may lack the authority or power to act in the case except in a particular way.* Under such circumstances, it is now generally held that the court had no jurisdiction. As pointed out in the case of *Spreckels S. Co.* v. *Industrial Acc. Com.,* 186 Cal. 256, 260 [199 P. 8], 'the word is frequently used as meaning authority to do the particular thing done, or, putting it conversely, a want of jurisdiction frequently means a want of authority to exercise in a particular manner a power which the board or tribunal has, the doing in excess of the authority possessed.' '' (Emphasis added.) We also said in *First Industrial Loan Co.* v. *Daugherty,* 26 Cal.2d 545, 556 [159 P.2d. 921], that ''It is elementary that power given to the Commissioner of Corporations (by section 10 of the act) 'to establish such rules and regulations as may be reasonable or necessary to carry out the purposes and provisions of this act' *does not include power to alter the statute or enlarge or impair its scope.''* (Emphasis added.)

It seems apparent that if the involuntary mutualization provisions for insolvent insurance companies are applicable the commissioner was acting without statutory authority in approving a plan of mutualization based upon the statutory provisions relating to voluntary mutualization of solvent companies and that his approval thereof was void, as was his agreement to approve such a plan. The rule is settled that a contract in violation of an express statutory provision is void and that it is not necessary that the statute expressly so declare (*City of Oakland* v. *California Const. Co.,* 15 Cal.2d 573, 576 [104 P.2d 30]). A contract made in any manner except that expressly provided in the applicable statute is ipso facto void (*Dale* v. *Palmer,* 106 Cal.App.2d 663, 667 [235 P.2d 650]). If upon review of all the legislation on the subject the contract appears to contravene the design and policy of the laws, the courts will not enforce it (*Kreamer* v. *Earl,* 91 Cal. 112 [27 P. 735]; *Loew's Inc.* v. *Cole,* 185 F.2d 641). See *Hill* v. *Bank of San Pedro,* 41 Cal.App.2d 595, 607 [107 P.2d 399]; *County of San Diego* v. *California Water etc. Co.,* 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747]; *Film Producers, Inc.* v. *Jordan,* 171 Cal. 664 [154 P. 605].

The parties are in disagreement as to whether or not the mutualization provisions were litigated at the time the order of December 4, 1936, was made. The insurance commissioner says that *"Presumably* these provisions did not go entirely unchallenged in the proceedings leading up to the Order of Rehabilitation." (Emphasis added.) (Insurance commissioner's answering brief, p. 61.) New company asserts that the "validity" of the rehabilitation agreement was put in issue and decided by the order of December 4, 1936, and that the same has been approved by this court. From all that appears, it is obvious that the precise question here involved has never been passed upon. It most certainly has not been passed upon by an appellate court, or by this court. Respondent, new company, points to the following quotations from the pleadings in the original proceeding as showing that the mutualization provisions of paragraph 20(a) were litigated. "Answer of Certain Interveners to Petition for Approval of Second Proposed Rehabilitation and Reinsurance Agreement, Folios 2757-2759 of Transcript on Appeal. L.A. 16182:

"That said plan, if executed, would be entirely void and of no effect, and would not be binding upon the parties thereto, and that the execution of the same is beyond the authority of the said Samuel L. Carpenter, Jr., as Insurance Commissioner of the State of California and as Conservator of The Pacific Mutual Life Insurance Company of California [old company], and that the execution of said agreement and the transfer of the assets by the said Insurance Commissioner is wholly unauthorized by the Insurance Code of the state of California and is entirely beyond the power of the said Samuel L. Carpenter, Jr., as Insurance Commissioner and as Conservator as aforesaid, and the said agreement will be void when executed and beyond the power of the Insurance Commissioner under the statute in such cases made and provided and that the said agreement is of no binding effect whatever on any of the parties thereto and that any acts done pursuant thereto are wholly null and void."

"Amended Complaint in Intervention of Certain Intervenors, Folio 3882 of Transcript on Appeal, L.A. 16182:

"That the approval of said agreement is beyond the authority and jurisdiction of this court and, if given, would be void and of no force and effect, for the reason that authority therefor is not given in, and, in fact, is forbidden by, the terms and provisions of said Insurance Code of California, and, in particular, of articles is [sic] and 14 of chapter 1 of part 2 of division 1 thereof."

It appears to me that what was undoubtedly meant by these pleadings was that the *organization* of *new company* was said to be beyond the commissioner's power since that was the major issue in *Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307 [74 P.2d 761].

The next question that arises is whether or not the provisions for mutualization *could* have been litigated in that proceeding inasmuch as mutualization was not to take place until between 1946 and 1948, or "so long as the Conservator or a Liquidator of the Old Company may continue to hold any or all of said stock. . . ." (Paragraph 20(a), rehabilitation agreement.) The proposed voluntary mutualization plan was also to be in accordance "with the laws of the State of California in effect at the time of said request. . . ." The plan was also not to be proposed unless the price determination committeee "shall determine whether in their opinion the proposed voluntary mutualization of the New Company . . . can then be practicably accomplished. . . ." In *Silva* v. *City & County of San Francisco,* 87 Cal.App.2d 784 [198 P.2d 78], a county board of supervisors passed a resolution that certain land of plaintiff's should be acquired when necessary. Plaintiff sued for a declaration as to the value of his property. The court, in refusing to place plaintiff's valuation on the property, declared: "The court may take judicial knowledge that real estate values do not remain constant. The value fixed during the present period may be disproportionate to what should be paid when the recreation department of the city decides to use the property as part of a 'playground.' Plaintiff seeks a final determination that the property is worth $10,000 and that *if* and *when* defendant chooses to take the property this will be the amount it must pay." (Emphasis that of the court.) It was also said that ". . . the present complaint alleges in substance that the value of the property may be determined through condemnation proceedings when defendant deems it 'necessary.' The only declaratory judgment that could be rendered under the allegations of the complaint would be of an advisory nature— namely, that when defendant deems it necessary to institute condemnation proceedings the price be fixed at the then market value." (Pp. 788-789.)

In *Young* v. *Young,* 100 Cal.App.2d 85, 87 [223 P.2d 25], it was held that an action to establish a foreign decree of divorce in California, and for ratification by the California court of a property settlement included in the foreign de-

cree, did not present a justiciable controversy in the absence of a showing that defendant had refused or failed to comply with the foreign decree or the terms of the property settlement agreement. It was held that ''The rule is accurately stated in 1 California Jurisprudence (1921) at page 335, section 25, as follows: 'To invoke the jurisdiction of a court of justice, it is primarily essential that there be involved a genuine and existing controversy, calling for present adjudication as involving present rights.' (See also *Neill* v. *Five C. Refining Co.*, 79 Cal.App.2d 191 [179 P.2d 818]), wherein Mr. Justice Drapeau thus pointedly states the rule at page 193, 'An action not founded upon an actual controversy, or prosecuted ''for the gratification of the curiosity of the litigants'' is collusive and will not be entertained. [Citing cases.]' ''

In *Merkley* v. *Merkley*, 12 Cal.2d 543, 547 [86 P.2d 89], the court stated that ''The facts in the record present an academic question only. The courts will not exercise the discretionary power to declare rights which do not give rise to a present controversy.''

In *County of San Diego* v. *California Water etc. Co.*, 30 Cal. 2d 817, 823, 826 [186 P.2d 124, 175 A.L.R. 747], a case involving an agreement by a county to relocate a county highway, we enunciated the following rule: That if the Legislature had provided a method by which a county or city might abandon or vacate roads, that method was *exclusive*. We said: ''It is clear, however, that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public. (See *Miller* v. *McKinnon*, 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570], and cases cited therein; *Pan American Petr. & Transp. Co.* v. *United States*, 273 U.S. 456, 505-506 [47 S.Ct. 416, 71 L.Ed. 734]; *American Surety Co. of N. Y.* v. *United States* (C.C.A. 10th), 112 F.2d 903, 906.) In the American Surety Company case the court stated that the government could not be estopped so as to 'frustrate the purpose of its laws or thwart its public policy.' (112 F.2d, at p. 906.) In 3 McQuillin, Municipal Corporations [2d ed., 1943], section 1266, it is said that various statutory procedures or steps exist to protect citizens and taxpayers from ill-considered contracts or those showing favoritism and that if recovery is allowed for property or services on the ground of estoppel or implied contract, 'then it follows as the night the day that the statute or charter provision can always be evaded and set at naught. The

author adds that the rule denying indirect enforcement of such void contracts harmonizes with our governmental system, appears to be supported by reason, and is not unjust, because the other party is charged with notice of the law."

At any rate, the *plan* of mutualization, as distinguished from the *provisions* for mutualization as found in the rehabilitation agreement, has never until this case, been passed upon. That plan, while following the outline contained in Paragraph 20(a) made some 10 years prior to the promulgation of the one here under consideration, is an entirely different matter and may properly be held void as not in accordance with the statutory scheme for involuntary mutualization of insolvent insurance companies seized by the commissioner under the provisions of sections 1010 and 1011 of the Insurance Code. The rule enunciated in *County of San Diego* v. *California Water etc. Co., supra,* hereinabove set forth would be applicable if the plan of mutualization is held void as against public policy and as being in excess of the commissioner's jurisdiction.

It should be noted that Paragraph 20(f) contains a provision to the effect that if all, or any part, of the paragraph should be contrary to law, or illegal, or void, the vulnerable provision should be deemed separable and the balance of the agreement should stand. If, as I believe, the validity of Paragraph 20(a) has never been before determined, the provision just noted would prevent anything that has been heretofore determined by either this court, or any appellate court, from conflicting with the determination made here.

### TRIAL DE NOVO

If the procedure for involuntary mutualization had been followed, as it should have been, this question would never have arisen. Section 1048 of the Insurance Code provides that after the formulation of the mutualization plan, it "shall" be submitted by the commissioner to the court for its approval. The clear import of the procedure outlined for insolvent organizations is that those possessed of property rights in them must be accorded *court* protection at *every* stage. For example, the *court* appoints the appraisers (§ 1051). Such court approval, required by section 1048, accords the interested parties the equivalent of a trial de novo.

According to the majority opinion, the "alternative" reason given for affirmance is reliance upon the doctrine of res judicata. That this reason is patently false is shown by Mr.

Justice Traynor when he points out that the court "could obviously not approve [the] plan at the time it entered its order approving the rehabilitation agreement. Moreover, it did not expressly approve in advance the carrying out of any mutualization plan that might be presented by the price determination committee." He shows that there is reserved to the court, by the agreement, continuing jurisdiction to approve or disapprove plans to be developed in the future for mutualization or other disposal of the stock in the hands of the commissioner. He points out that to so interpret the order subserves the primary purpose of section 1037, subdivision (d), of the Insurance Code by securing to all interested parties "their right to court scrutiny." Appellants have not been accorded "court scrutiny" in its true sense.

Appellants correctly contend that the order of the commissioner approving the plan of mutualization was subject to full judicial review by the superior court. It is argued that the commissioner, in making his order, acted in a judicial capacity rather than in an administrative or legislative capacity as contended by respondents. Appellants contend that in reviewing a decision or order of a statewide administrative agency or of a state officer, the superior court must reweigh the evidence and determine for itself according to its independent judgment whether or not the decision is supported by the weight or preponderance of the evidence in every case where state judicial functions are involved. They rely upon *Thomas* v. *California Emp. Stab. Com.*, 39 Cal.2d 501, 504 [247 P.2d 561]; *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20]; *Laisne* v. *California State Board of Optometry*, 19 Cal.2d 831, 834-835 [123 P.2d 457]; and *Drummey* v. *State Board of Funeral Directors & Embalmers*, 13 Cal.2d 75 [87 P.2d 848]. Respondents, on the other hand, argue that the commissioner's order was an exercise of executive power and was not the exercise of such full judicial power as to entitle appellants to have the trial court exercise its independent judgment with respect to the weight of the evidence. Respondents rely upon the cases of *Bank of Italy* v. *Johnson*, 200 Cal. 1 [251 P. 784]; *Doble Steam Motors Corp.* v. *Daugherty*, 195 Cal. 158 [232 P. 140]; *McDonough* v. *Goodcell*, 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205], and *Southern Calif. Jockey Club, Inc.* v. *California etc. Racing Board*, 36 Cal.2d 167 [223 P.2d 1].

The duties of the commissioner, as set forth in section 12921 have been held to be "that of a minister of the court

in possession of the property, to the end of conserving the rights of everybody having any interest'' (*H. D. Roosen Co.* v. *Pacific Radio Pub. Co.,* 123 Cal.App. 525 [11 P.2d 873]) and discretionary (*Garris* v. *Carpenter,* 33 Cal.App.2d 649, 657 [92 P.2d 688]). It was held in *Caminetti* v. *Guaranty Union Life Ins. Co.,* 22 Cal.2d 759, 764 [141 P.2d 423], that the commissioner's ''. . . office is not to perform functions in aid of the court's jurisdiction to decide a controversy between litigants, but he acts as a statutory officer, subject however to judicial supervision to prevent an arbitrary exercise of power or neglect of duty.'' The court in the Caminetti case, however, was referring to the commissioner as a receiver of the assets of insurance companies and stated that he did not derive his power from the court, but from the statute.

The distinction in the two lines of cases relied upon by appellants and respondents is that in those relied upon by appellants an existing vested property right was extinguished, or taken away, by the administrative order. For example, in the Drummey case (13 Cal.2d 75) Drummey and Wilson had been duly licensed embalmers and the State Board of Funeral Directors and Embalmers ordered their licenses suspended. This court held that it was dealing with a statute which conferred certain fact-finding powers on a board exercising statewide jurisdiction and that there was no ''indication that the legislature intended the facts so found to be binding on the courts''; that no method of review was provided in the statute. We held that we could see no escape from the conclusion that in such a proceeding the court to which the application for mandate is made must weigh the evidence, and exercise its independent judgment on the facts as well as the law, if the complaining party is to be accorded his constitutional rights under the state and federal Constitutions. ''The state constitutional provision discussed, *supra,* prohibits the conferring of judicial power on such administrative boards'' (p. 84).

In *Laisne* v. *California State Board of Optometry, supra,* the California State Board of Optometry had revoked Laisne's certificate of registration to practice optometry in this state. We held there that ''On the authority of the Drummey case the only type of review that would afford appellant his full constitutional rights would be a complete trial de novo as outlined in the decision in that case.'' (P. 843.)

In *Moran* v. *Board of Medical Examiners, supra,* the State

Board of Medical Examiners revoked the license of Dr. Moran to practice medicine in this state. We held "That the trial court in this case was 'authorized by law to exercise its independent judgment on the evidence' is well established. (See *Dare* v. *Board of Medical Examiners* (1943), 21 Cal.2d 790, 795 [136 P.2d 304]; *Sipper* v. *Urban* (1943), 22 Cal.2d 138, 141 [137 P.2d 425]; *Hohreiter* v. *Garrison* (1947), 81 Cal.App.2d 384, 402 [184 P.2d 323].) As stated in the last cited case, at page 402, 'Thus, the ultimate power of decision rests with the trial court.' " (P. 308.)

In *Thomas* v. *California Emp. Stab. Com.*, 39 Cal.2d 501 [247 P.2d 561], it was held that unemployment benefits provided for by the Unemployment Insurance Act were such property rights as to fall within the rule that persons deprived of property rights by a statutory administrative agency were entitled to a limited trial de novo in the superior court.

Respondents' position (which has been adopted in toto by the majority opinion) is that the "Order" of the commissioner was merely a "permit" which allowed mutualization if the policyholders so voted (§ 11526, subd. (d)) and that the order did not deprive anyone of vested property rights. We have heretofore held (*Thomas* v. *California Emp. Stab. Com.*, 39 Cal.2d 501, 504 [247 P.2d 561]; *Laisne* v. *California State Board of Optometry*, 19 Cal.2d 831 [123 P.2d 457]; *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20]; *Drummey* v. *State Board of Funeral Directors & Embalmers*, 13 Cal.2d 75 [87 P.2d 848]) that where an existing property right is extinguished by the questioned administrative order the one so deprived is entitled to a trial de novo in the superior court. Appellants here are the beneficial owners of the stock of the new company which is held by the voting trustees for their benefit. Under the proposed mutualization plan, this stock will be nonexistent and they will be forced to accept a price therefor, as well as terms, over which they have exercised no control. Mr. Justice Traynor has pointed out that if the proper procedure had been followed, the rights of these people would have been protected by a court of law, rather than subjected to the action of one man acting in three irreconcilable positions. The assets of old company were transferred to new company in exchange for all the stock of new company which, in the beginning, was held by the commissioner, as conservator for the benefit of the creditors, policyholders, and stockholders of old company (*Caminetti* v. *Pacific Mut. L. Ins. Co.*, 22 Cal.2d

344, 351 [139 P.2d 908]). Later, the stock of new company was transferred to voting trustees who held legal title thereto, ". . . with the power to exercise all the rights of ownership. The commissioner, however, retains the entire beneficial interest for the benefit of creditors of the old company and others interested." (22 Cal.2d, at page 357.) As stated by the insurance commissioner in his opinion and decision (page 7 of the exhibit) : "Greatly epitomized, the plan [of mutualization] determined that both the Participating and Non-Participating Life Departments of the company should be mutualized by the *purchase and cancellation of all of the outstanding shares of capital stock of the New Company,* thus converting the New Company into a non-stock insurer conducted for the benefit of its members who shall be the policyholders of the participating and non-participating life classes." Inasmuch as purchase and cancellation of the stock of new company will be accomplished by the proposed mutualization, it appears that appellants have been deprived, by the order, of their vested beneficial ownership of that stock so as to entitle them to a trial de novo within the rule of the cited cases.

The majority opinion states: "The approval of the mutualization plan by the commissioner did not involve any deprivation of property rights or vested rights; it was in essence a permit or license authorizing the new company to purchase its own stock." This *would* be true *if* new company members owned their own stock (and therein lies the fallacy in calling new company a solvent corporation with all that term connotes). But the matter is not quite so simple. All the beneficial ownership, which is the *real* ownership is held by the policyholders and stockholders of old company; all the legal title is held by the voting trustees (appointed by the commissioner) for the benefit of *old company* policyholders and stockholders. In other words, new company holds neither legal nor beneficial ownership of its stock, but through the medium of the mutualization plan is given the right to deprive the beneficial owners of their property in clear violation of the law as heretofore propounded by this court. We held in the Drummey case that we could see no escape from the conclusion that the court must weigh the evidence and exercise its independent judgment on the facts as well as the law, if the complaining party was to be accorded his *constitutional rights* under the state and federal Constitutions. "The state constitutional provision discussed, *supra,*

prohibits the conferring of judicial power on such administrative boards."

In *St. Joseph Stock Yards Co.* v. *United States,* 298 U.S. 38, 52 [56 S.Ct. 720, 80 L.Ed. 1033], the court stated: "Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive *where constitutional rights of liberty and property are involved,* although the evidence clearly establishes that the findings are wrong and *constitutional rights have been invaded,* is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. *The principle applies when rights either of persons or of property are protected by constitutional restrictions.* Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority." (Emphasis added.) This case and this statement were relied upon by us in the Drummey case (*supra,* 13 Cal.2d 75, 85) and no information has been presented to me to show that the rule there set forth has been in any way changed. No clearer case than this could possibly be found to illustrate the evils to be avoided. Old company stockholders and policyholders have been, and are, at the "mercy" of administrative officials; those officials may, during the last 10 years, have been either "expert and impartial" or "subservient."

I have heretofore set forth at length the self-evident fact that appellants are possessed of vested property rights of which they are being deprived. In *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U.S. 287, 289 [40 S.Ct. 527, 64 L.Ed. 908], it was held: "The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. *Prentis* v. *Atlantic Coast Line R. Co.,* 211

U.S. 210 [29 S.Ct. 67, 53 L.Ed. 150]; *Lake Erie & W. R. Co.* v. *State Public Utilities Com.*, 249 U.S. 422, 424 [39 S.Ct. 345, 63 L.Ed. 684]. In all such cases, *if the owner claims confiscation of his property will result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts: otherwise the order is void because in conflict with the due process clause, fourteenth amendment. Missouri Pac. Ry. Co.* v. *Tucker,* 230 U.S. 340, 347 [33 S.Ct. 961, 57 L.Ed. 1507]; *Wadley Southern Ry. Co.* v. *Georgia,* 235 U.S. 651, 660, 661 [35 S.Ct. 214, 59 L.Ed. 405]; *Missouri* v. *Chicago, B. & Q. R. Co.,* 241 U.S. 533, 538 [36 S.Ct. 715, 60 L.Ed. 1148]; *Oklahoma Operating Co.* v. *Love,* 252 U.S. 331 [40 S.Ct. 338, 64 L.Ed. 596].'' (Emphasis added.)

Appellants here complain bitterly because the mutualization plan provides that the price to be paid for new company's stock (of which they are the *beneficial owners*) is $3,000,000 while that same amount was originally taken out of old company's funds to purchase new company's stock and, *in addition,* all the other assets of old company (over $200,-000,000 in assets plus such intangibles as going agency organization and concern, good will, etc., ''worth several millions of dollars'' [*Carpenter* v. *Pacific Mut. L. Ins. Co.,* 10 Cal.2d 307, 325 (74 P.2d 761)]) were turned over to new company! It surely must be crystal clear to everyone who can think that such an outrageous confiscation of property without due process of law has never before taken place in this state.

### EVIDENCE

In the trial court the evidence consisted of all of the record of the proceedings before the insurance commissioner, consisting of the reporter's daily transcript, the exhibits and the commissioner's decision. Appellants contend that they were prohibited from introducing evidence, or offering to do so, because of the rulings of the trial court; that no issues of fact were litigated; that the court ruled that it was not empowered to exercise its independent judgment on the evidence taken before the commissioner. Respondents state that appellants were given leave to serve and file a motion and affidavits relative to the introduction of additional evidence and failed to do so. The memorandum opinion and order (July 2, 1951, Clk. Tr., 237-239) contains this statement: ''After a careful study of the briefs submitted and the au-

thorities cited I have come to the conclusion that, so far as any matter of fact is concerned, this Court is limited to determining whether or not the findings of the Commissioner are *supported by substantial evidence in the light of the whole record, but that it is for this court to exercise its independent judgment in interpreting the Rehabilitation Agreement and in construing and applying section 11527* of the Insurance Code. . . .

"I have come to the further conclusion that this Court cannot receive any additional evidence, but that upon proper showing may remand this matter to the Commissioner to take further evidence and reconsider the case in the light of such evidence. . . ."

Appellants point to the statements made by the trial judge on the settlement of findings that *"I think it must be very evident if I had had this case to decide on a new question of fact my decision might have been the opposite"* (emphasis added; page 766, Rep. Tr.) and "It [fixing the price] is very complex, and I think you are making it more complex. My finding was, and the basis of my determination was that they [the price determination committee] had a reasoned basis in fixing the price. That is the fact. If they had acted unreasonably then I would have had to set it aside. It was only because I could not convince myself that it was not a rational conclusion that they acted upon that I ever decided the case the way I did. *Because I could not take the facts and arrive at the same conclusion; not by a long shot. But because I did not feel that I could substitute my opinion for theirs, or substitute my opinion for the Commissioner's, that is the reason I arrived at the conclusion that I did.* But that is the crux of it. It is not the details that they took in. What you are entitled to find now is entirely evidentiary." (Emphasis added.) The inference from this is obvious—that had the involuntary procedure been followed, the court would have withheld its approval because the plan did not protect the interests of those owning the beneficial interests.

The just-quoted statement made by the trial court shows, without equivocation, that had there been a trial de novo his decision would have been contrary to that reached. His statement shows that he was convinced that the weight of the evidence was with appellants but, believing himself limited by the substantial evidence rule, his conclusion was in favor of respondents. The only rational conclusion to be drawn from the facts of this case is that appellants were possessed of a

vested property right and, therefore, should have been given a trial de novo in a *judicial tribunal* provided by the state for the protection of private property rights. Because appellants were not afforded a trial de novo they have been deprived of their property without the due process of law guaranteed to them by both the state and federal Constitutions.

### SUMMARY OF MAJOR POINTS

(1) It is my opinion that the provisions of the Insurance Code relating to voluntary mutualization of solvent insurance companies were not applicable to new company. As I have heretofore pointed out, new company was organized because of the insolvency of old company and cannot be considered as a solvent company until the liabilities arising from the non-can policies have been paid or sufficient funds accumulated to pay them. The voluntary mutualization provisions of the code in and of themselves show that they were intended by the Legislature to apply to not only a *solvent* company but to a company not so closely supervised by the commissioner as the one here under consideration. The ordinary solvent company is not such a hybrid as we have in new company. In using the voluntary procedure, we have the commissioner, acting as conservator and beneficial owner of the stock of new company, agreeing to vote for the plan of mutualization as proposed by the price determination committee. As conservator, and beneficial owner of the stock of new company, he is *supposed* to be protecting the rights and interests of those in the position of appellants. When, as commissioner, he approves the proposed plan as fair and equitable, under the voluntary mutualization procedure, he is concerned with the fairness of the plan as it concerns those interested in new company. If the normal solvent company were being mutualized, the plan of mutualization would be proposed by the company itself, approved by its board of directors, adopted by a majority vote of its own shareholders, and then approved by the commissioner who, presumably, would not have seen the plan, or even heard of it, prior to the time it was presented to him for his approval as fair and equitable to those concerned—the shareholders and policyholders of the solvent company.

The following statement is found in the majority opinion: "In numerous cases where the action of an administrative officer was necessary *to prevent defeat of the statutory scheme*, his participation has been upheld although the grounds for

disqualification were much more serious than those raised here." (Emphasis added.) The author again assumes too much. He assumes that the "statutory scheme" was being carried out. On the contrary, the statutory scheme is being *defeated.* The entire scheme for rehabilitation of insolvent corporations, and the statutory protection of the interested persons therein, is abrogated through the use of the procedure designed for mutualization of solvent corporations.

(2) I am also of the opinion that Paragraph 20(a) of the rehabilitation agreement has never before been judicially determined and, therefore, its provisions are not res judicata of the present controversy. I have pointed out that there is a separability clause in the rehabilitation agreement and that nothing heretofore done by this, or an appellate court, will be affected by a holding by this court that the parties may not validly contract to mutualize new company contrary to the applicable statutory provisions.

(3) There should have been a trial de novo in the superior court where evidence relative to the proper method to be used by the price determination committee, or *court-appointed* appraisers, could have been introduced by both sides and a determination made by a judicial trier of fact. Both appellants and respondents here devote many pages of their numerous briefs to such material. Such methods are obviously matters for experts in the field of insurance and should be the subject of testimony in the trial court.

(4) If, as I firmly believe, the procedure for involuntary mutualization of insolvent companies is the proper procedure, sections 1049, 1050, 1051 and 1052 of the Insurance Code contain detailed provisions for hearings and the appointment by the court of appraisers to appraise "the then outstanding shares of the capital stock of such insurer, without regard to any appreciation or depreciation arising out of said mutualization plan as so approved or modified. Such appraisement shall fix the reasonable value of such shares of capital stock, including the goodwill, if any, of such insurer, and shall state the value, if any, assigned to such goodwill; and if the appraisers shall have found that such insurer has no goodwill, such finding shall be stated. Such appraisement, when confirmed by said court, shall be final and conclusive." (§ 1051.)

The use of the involuntary mutualization procedure for an insolvent company follows logically from the original proceeding under sections 1010 and 1011. It should be noted that section 1054 (still under the Insolvency and Delinquency

sections) provides that: *"Such insurer, after mutualization, shall be a continuation of the original insurer, and such mutualization shall not affect existing suits, rights or contracts except as provided in said mutualization plan as approved.* Such insurer, after mutualization, shall exercise all the rights and powers and perform all the duties conferred or imposed by law upon insurers writing the classes of insurance written by it, and to protect rights and contracts existing prior to mutualization, subject to the effect of said mutualization plan.'' (Emphasis added.)

We held in *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 10 Cal.2d 307, 334 [74 P.2d 761], that ''reinsurance'' was a contract by which one company (new company) takes over the insurance risks of another company (old company) and becomes substituted as an insurer in the place and stead of the original insurer. This holding is also the logical result of following the procedure outlined in the Insolvency and Delinquency division of the Insurance Code.

From what Mr. Justice Traynor has said in his dissent and for the reasons heretofore set forth by me, the conclusion is *inescapable* that the judgment should be reversed.

SCHAUER, J.—I concur generally in the discussion, the reasoning and the conclusions of Mr. Justice Carter.

Appellants' petition for a rehearing was denied July 27, 1955. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.